UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IHS DIALYSIS, INC.; IHS DIALYSIS OF
MASSACHUSETTS, LLC; and IHS OF NEW
YORK, INC.,

                     Plaintiffs,

     -against-

DAVITA, INC.,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDED COMPLAINT**

12 Civ. 2468-ER

**JURY TRIAL DEMANDED**

Plaintiffs, IHS Dialysis, Inc., IHS Dialysis of Massachusetts, LLC, and IHS of New York, Inc. (collectively, "Plaintiffs" or "IHS"), by their attorneys, Garfunkel Wild, P.C., allege for their Amended Complaint against the Defendant, DaVita, Inc. ("DaVita"), as follows:

## NATURE OF THE ACTION

1.     This lawsuit concerns the monopolization of, and restraint of trade in, markets for outpatient dialysis services.  Dialysis treatment is a life-sustaining therapy critical to patients with end-stage renal disease (ESRD).  It replicates kidney function by removing toxins and excess fluid from the blood.

2.     Defendant DaVita is based in Denver, Colorado, and is the second largest provider of outpatient dialysis services in the United States, after Fresenius Medical Care North America.  It operates more than 1,800 outpatient dialysis clinics, in 42 states and the District of Columbia, at which approximately 125,000 ESRD patients regularly receive treatment.  In 2010, DaVita's revenues were approximately $7.63 billion.

3.      As recognized by the Federal Trade Commission in connection with the Consent Agreement it entered into with DaVita in September 2011, the market for outpatient dialysis treatment in the United States is highly concentrated. *See In the Matter of DaVita, Inc.*, FTC Docket No. C-4334. In many local markets throughout United States, DaVita wields significant market and, in some cases, monopoly power. There are also significant barriers to entry into these markets.

4.      Since at least 2007, DaVita has engaged in an intentional and persistent campaign to obtain, maintain, and enhance its market and, in some cases, monopoly power through its own anticompetitive conduct and by conspiring with others to engage in anticompetitive conduct. For example, (a) entering into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources or other these referrals to lock-up a significant number of patient referrals on a long-term basis; (b) entering into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis; (c) entering into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers; (d) inappropriately and without legitimate business justification warehousing space and licenses so as to prevent other potential competitors from entering the local market; (e) commencing baseless lawsuits and threatening to commence baseless lawsuits against former employees, referral sources, managed care companies, pharmaceutical companies, and competitors in an effort to prevent other potential competitors from entering the local market; and (f) engaging in inappropriate and predatory business conduct designed to prevent the potential new entrants to gain any foothold in the

market, including without limitation threatening loss of jobs, hiring staff for no legitimate business purpose to prevent competitors from attaining necessary staffing needs, and disparaging IHS to employees and other parties in the local market.

5.     This anticompetitive conduct has had significant, adverse effects upon competition in the relevant markets.  These effects have included the exclusion of actual and potential providers of outpatient diagnostic imaging services, prices above competitive levels, output below competitive levels, and price discrimination or predatory pricing.

6.     Additionally, DaVita's anticompetitive conduct has had significant adverse effects upon the ESRD patients treating in the local markets.  For example, due to DaVita's overwhelming market control in many geographical locations, DaVita has: (a) permitted the patient quality care at its facilities to decline below acceptable levels; (b) failed to update and upgrade their facility amenities, such as televisions, radios, internet access, and equipment; (c) made unnecessary wage cuts and cuts to employee benefits; (d) violated state laws, including without limitation, disability laws; and (e) improperly demanded employees to sign non-compete restrictive covenants through threats of termination.

7.     Plaintiffs have suffered significant damages to their business and property as a result of DaVita's anticompetitive conduct that has had significant, adverse effects upon competition in the relevant markets.  These damages include loss of patients, loss of revenues, and loss of profits.

8.     IHS currently operates outpatient dialysis facilities in the Bronx, New York; Flushing, New York; and Quincy, Massachusetts.  It also is in the process of attempting to open facilities in other Eastern United States locations, including Georgia.

2186339v.2

9.     In its currently operating facilities, IHS has been significantly hampered in its ability to successfully provide needed services to patients as a direct and proximate result of DaVita's anticompetitive conduct.

10.     In its planned-to-open facilities, IHS has been significantly delayed and hindered in its ability to open these facilities as a direct and proximate result of DaVita's anticompetitive conduct.

## PARTIES

**Plaintiffs**

11.     Plaintiff IHS Dialysis, Inc. is a Florida business corporation, with its principal place of business located at 6001 Broken Sound Pkwy, Suite 502, Boca Raton, Florida 33487.

12.     Plaintiff IHS Dialysis, Inc., through its affiliate, IHS Dialysis of Massachusetts, LLC, operates an outpatient kidney dialysis facility known as the Quincy Center Dialysis, located at 1250 Hancock Street, Suite 110N, Quincy, Massachusetts 02169 (the "Quincy Center").

13.     Plaintiff IHS Dialysis, Inc., through its affiliate, IHS Dialysis of Massachusetts, LLC, also operates a specialized outpatient kidney dialysis facility, offering new, cutting edge technology, known as the Advanced Kidney Therapies, located at 1250 Hancock Street, Suite 204N, Quincy, Massachusetts 02169.

14.     Plaintiff IHS Dialysis, Inc. is, and at all times herein, has been, engaged in commerce or trade "among the several States, or with foreign nations" as required by sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

-4-

15.     Plaintiff IHS of New York, Inc. is a New York business corporation, with its principal place of business located at 6001 Broken Sound Pkwy, Suite 502, Boca Raton, Florida 33487.

16.     Plaintiff IHS of New York, Inc. holds the New York state operating licenses for two outpatient kidney dialysis facilities:  (a) the Pelham Parkway Dialysis Center, located at 1400 Pelham Pkwy South, A-1, Bronx, New York 10461 (the "Bronx Center"), and (b) the Queens Dialysis at South Flushing facility, located at 71-12 Park Ave, Flushing, New York 11365 (the "Flushing Center")

17.     Plaintiff IHS of New York, Inc. is, and at all times herein, has been, engaged in commerce or trade "among the several States, or with foreign nations" as required by sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

**Defendants**

18.     Upon information and belief, Defendant DaVita, Inc. is a Delaware business corporation, with its principal place of business located at 1551 Wewatta Street, Denver, Colorado 80202.

19.     Defendant DaVita is, and at all times herein, has been, engaged in commerce or trade "among the several States, or with foreign nations" as required by sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

## JURISDICTION AND VENUE

20.     IHS brings this lawsuit under section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of suit, including reasonable attorneys' fees, against DaVita for the injuries sustained by IHS in its business or property by of DaVita's violations as alleged

herein of the federal antitrust laws, particularly sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as amended.

21.     This Court has jurisdiction over the subject matter and the parties under 15 U.S.C. § 15 and 28 U.S.C. § 1337.

22.     Venue is appropriate in this Court under 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 in that DaVita is found, transacts business, has an agent or maintains an office in this District, the claims arose in part in this District, and DaVita directly or indirectly performed acts within this District in furtherance of the conspiracy and other anticompetitive actions alleged herein.

## GENERAL DESCRIPTION OF OUTPATIENT DIALYSIS SERVICES AND PRODUCT MARKET

23.     "Dialysis" means filtering of a person's blood, inside or outside the body, to replicate the functions of a kidney.

24.     "ESRD" means end stage renal disease, a chronic disease characterized by a near total loss of the function of the kidneys, which in healthy people remove toxins and excess fluid from the blood.

25.     Patients who suffer from chronic ESRD generally require constant and regular dialysis treatments generally at least three times per week for three to four hours per treatment.

26.     Patients who suffer from ESRD require regular, routine and constant dialysis treatments for the rest of their lives.

27.     "Outpatient Dialysis Services" or "In-Center Hemodialysis" means all procedures and services related to administering chronic dialysis treatment to patients suffering from ESRD at outpatient dialysis centers.

28.     In-Center Hemodialysis is the most commonly used form of dialysis for ESRD patients.

29.     In-Center Hemodialysis accounts for well over 80% of all treatment to ESRD patients.

30.     "Home Hemodialysis" ("HHD") is a dialysis modality that is provided in conjunction with, and through, the same dialysis centers as Outpatient Dialysis Centers to treat chronic ESRD patients.

31.     HHD is generally performed by the patient at home on certain HHD machines and the patients who receive such treatments require training, monitoring, and other support from their outpatient dialysis center on a routine and regular basis.

32.     "Peritoneal Dialysis" ("PD") is a dialysis modality that is provided in conjunction with, and through, the same dialysis centers as Outpatient Dialysis Centers to treat chronic ESRD patients.

33.     PD is generally performed by the patient at home, through continual ambulatory peritoneal dialysis or continues cycling peritoneal dialysis and the patients who receive such treatments require regular visits to their Outpatient Dialysis Centers and other support from an outpatient dialysis center.

34.     HHD or PD are not truly alternative substitutes or interchangeable products to In-Center Hemodialysis because they still require the monitoring, support, and are performed in

conjunction with In-Center Hemodialysis. In other words, ESRD patients on HHD or PD still receive treatment through In-Center Hemodialysis centers.

35. HHD and PD are also not alternative substitute or interchangeable products to In-Center Hemodialysis as evidenced by the very small percentage of chronic ESRD patients that utilize such treatments and because of the medical training, costs, frequency of treatment required, and certain restrictions, including without limitation the requirement that HHD patients require a trained live-in partner to receive such treatment.

36. "Acute" dialysis services are provided at hospitals rather than in dialysis centers and address immediate and urgent renal care.

37. Acute dialysis services do not treat chronic ESRD.

38. Acute dialysis services are not part of the relevant market share for the dialysis market of the treatment of chronic ESRD.

39. Acute dialysis services for the treatment of chronic ESRD, therefore, is not a reasonable alternative to In-Center Hemodialysis.

40. Kidney transplant is the only other treatment option for a patient suffering from chronic ESRD.

41. Kidney transplant, however, is not a practical or viable substitute or interchangeable product for In-Center Hemodialysis. The wait time for donor kidneys – during which ESRD patients must continue receiving dialysis treatments – can exceed five years. Additionally, many ESRD patients are not viable transplant candidates. As a result, many ESRD patients have no alternative to ongoing dialysis treatments.

2186339v.2

42.     Kidney transplant is not a practical or viable substitute or interchangeable product for In-Center Hemodialysis because, among other reasons, transplants are rare, there are time delays, patient risk factors or illness/diseases that patients may suffer restrict candidacy, the costs associated with the procedure, donor availability, and the risks associated with transplant surgery.

43.     Therefore, the relevant market product in this instance is defined as, and is in fact, In-Center Hemodialysis for chronic ESRD patients that is performed at outpatient dialysis centers such as those operated by IHS and DaVita.

44.     There is simply no other reasonable interchangeability of use or the cross-elasticity of demand between In-Center Hemodialysis and any potential substitute for such treatment.

45.     The only other alternatives to In-Center Hemodialysis – Kidney transplant and, to a lesser extent, HHD or PD – are not reasonably interchangeable with In-Center Hemodialysis nor are such treatments in demand to the same extent as In-Center Hemodialysis.  For example, even assuming price of these potential alternative procedures decreased making them more attractive to patients, certain patients would still not be able to receive such treatments for a variety of other reasons.

46.     Outpatient dialysis facilities are subject to extensive federal, state, and local government regulation, including Medicare and Medicaid payment rules and regulations, state and federal anti-kickback laws, the Stark Law physician self-referral prohibition and analogous state law provisions, the federal and state False Claims Acts, and federal and state laws and

regulations regarding the collection, use, and disclosure of patient health information, as well as other state licensure laws and regulations.

47.     Failure to comply with these laws and regulations can result in imposition of severe sanctions, including termination of an operator's license and/or participation in the Medicare and Medicaid reimbursement programs.

48.     Outpatient dialysis facilities rely on patient referrals from physicians and other health care providers in the community, as well as referrals from hospitals and other community-based health care facilities.

49.     Outpatient dialysis facilities typically are reimbursed for services they provide to patients through the patients' commercial-insurance coverage or, if a patient lacks or has exhausted commercial-insurance coverage, through the Medicare or Medicaid Programs.  Under currently applicable reimbursement rules, the Medicare Program usually becomes the primary payer for outpatient dialysis services after a patient has been receiving treatment for 33 months.

50.     Under the federal reimbursement regime, applicable during the relevant time period, outpatient dialysis facilities also receive reimbursement for certain pharmaceutical products, including Epogen®, they provide for patients needing them during the course of dialysis treatment.

51.     The majority of patients who receive treatment for ESRD at In-Center Dialysis Centers receive payment for their chronic dialysis treatments through Medicare at a reimbursement rate set by Medicare and that a smaller percentage of ESRD patients are reimbursed through their private insurers.

52.     Therefore, because prices are generally fixed in the industry for reimbursement rates, demand related to In-Center Hemodialysis is driven by factors other than price such as quality of patient care, center amenities, types of services provided at centers, and level of services at the In-Center Hemodialysis centers.

53.     As stated above, HHD and PD are performed in conjunction with In-Center Hemodialysis and the prices for such services are also more fixed than flexible creating very little or no cross-price elasticity of demand between these potential alternative chronic ESRD treatments.

## DEFINITION OF THE RELEVANT MARKETS

54.     The relevant geographic market for the provision of In-Center Hemodialysis is defined by the distance ESRD patients are willing or able to travel to receive dialysis treatments, and therefore is local in nature.

55.     Because ESRD patients often suffer from multiple health problems and may require assistance traveling to and from the dialysis clinic, these patients are unwilling or unable to travel long distances to receive dialysis treatment.  As a general rule, ESRD patients do not travel more than 30 miles or 30 minutes to receive dialysis treatment, although travel times and distances vary dependent on geographic barriers, and whether an area is urban, suburban, or rural.

56.     Additionally, transportation options for patients receiving In-Center Hemodialysis may restrict a patient's willingness or ability to travel to certain facilities.  Thus, the markets are further narrowed in metropolitan areas of the country.

57.     As discussed above, DaVita competes in the local markets for outpatient dialysis services in 42 states and the District of Columbia.

58.     For the purposes of this lawsuit, the markets in which IHS has been damaged in its business or property as a result of DaVita's anticompetitive actions are:  (a) the Bronx/upper Manhattan/Westchester, New York; (b) Flushing, New York; (c) Quincy, South Shore, and the southern part of the Boston, Massachusetts metropolitan area; and (d) other areas and markets in which IHS currently is in the process of planning for or opening facilities (collectively, the "Markets").

59.     According to DaVita's website, DaVita operated or provided administrative services at 1,841 outpatient dialysis centers in the United States.

60.     Upon information and belief, in the Bronx, Upper Manhattan, and Westchester, New York there are approximately 30 In-Center Hemodialysis centers.

61.     DaVita owns approximately 19 of those 28 In-Center Hemodialysis centers, nearly 63% of the In-Center Hemodialysis centers in this defined market.

62.     Upon information and belief, in Flushing, Queens, DaVita also maintains a large market presence, owning at least two known In-Center Hemodialysis centers.

63.     Upon information and belief, in Quincy, South Shore, and the southern part of the Boston, Massachusetts metropolitan area, there are approximately 19 In-Center Hemodialysis centers.

64.     DaVita owns 16 of these In-Center Hemodialysis centers, or more than 84% of In-Center Hemodialysis centers in this defined market.

2186339v.2

65.     Before the opening of the IHS Quincy In-Center Hemodialysis center in November 2011, DaVita operated nearly 90% of the In-Center Hemodialysis centers in this relevant market.  Essentially, DaVita had, and has, no competitor in the Quincy, South Shore, and the southern part of the Boston, Massachusetts metropolitan area.

66.     DaVita has significant market power and monopoly power in the relevant geographic markets defined above.

67.     As a result of the stronghold in these geographic market areas, quality of care, and Outpatient Center Services have been caused to suffer to the detriment of ESRD patients (and the public at large).

68.     For example, prior to IHS' opening of the Quincy Center, quality of care, employee wages, benefits, and conditions, and facility amenities, such as equipment, chairs, televisions, and radios, were below industry standards.

69.     The substandard amenities, services, and employee wages, benefits, and conditions at the DaVita centers in the Quincy, South Shore, and the southern part of the Boston, Massachusetts metropolitan area was evidenced by the transfer of patients and staff from DaVita centers to the newly opened Quincy Center.

70.     The same substandard conditions and amenities also exist in the Bronx/Upper Manhattan/Westchester DaVita centers, as well as at DaVita centers in Flushing, Queens.

71.     The conditions and poor amenities and services available at the DaVita centers in these defined geographic market areas is a result of DaVita's monopoly power in these designated areas.

-13-

72.     DaVita ability to keep its costs down by providing substandard quality of care, amenities, services, and low wages, benefits, and job conditions, prevents competitors like IHS from entering the market place and competing because IHS cannot compete with the lower prices DaVita can charge for services.

## THE STRUCTURE OF THE RELEVANT MARKETS

73.     The markets for the provision of outpatient dialysis services are highly concentrated in each of the local areas identified above.

74.     There are also significant barriers to entry in these markets, the most significant of which is locating a nephrologist with an established referral base to serve as the facility's medical director.

75.     By law, each dialysis clinic must have a nephrologist medical director.

76.     The medical director is essential to the competitiveness of the facility because he or she is the facility's primary source of referrals.

77.     The lack of available nephrologists with an established referral stream is a significant barrier to entry into each of the relevant geographic markets identified above.

78.     Additionally, an area must have certain attributes (such as a rapidly growing ESRD population, a favorable regulatory environment, average or below nursing and labor costs, and a relatively low penetration of managed care) to attract entry.  The absence of these attributes is an additional barrier to entry into many of the relevant geographic markets.

79.     New entry into the relevant markets sufficient to deter or counteract the anticompetitive effects described above is unlikely to occur, and would not occur in a timely manner because it would take over two years to enter and achieve significant market impact.

## DAVITA'S ANTICOMPETITIVE CONDUCT

### Inappropriate Business Conduct

80.     DaVita, upon learning of potential new entrants into a local market, has engaged in inappropriate and predatory business conduct designed to prevent the potential new entrants to gain any foothold in the market.

81.     DaVita's inappropriate and predatory conduct includes disparagement of potential competitors – including IHS – to prospective patients, current employees, and referral sources, and threatening current referral sources, patients, and staff members with dire consequences if they "jump ship" to a competitor.

82.     DaVita's conduct is solely malicious and without any legitimate business justification.

83.     DaVita's inappropriate and predatory conduct has effectively and substantially excluded IHS and other actual and potential competitors from the outpatient dialysis services market or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

84.     For example, upon DaVita learning that IHS planned to open the Quincy Center, DaVita took action to prevent the Quincy Center's ability to sustain entry in that market.

85.     DaVita immediately threatened its employees with lawsuits and other fear tactics related to employees potentially working at the Quincy Center.

86.     DaVita advised its employees, including without limitation, facility administrators ("FAs"), housekeeping employees, registered nurses, and medical directors, that DaVita's

competitors, in particular the Quincy Center, were small competitors that would likely fail and be bought out by DaVita or its affiliates.

87.    DaVita advised its employees that if they left DaVita for IHS and DaVita later acquired these smaller competitors after they failed, those former DaVita employees would not have a job once DaVita completed its acquisition.

88.    DaVita disseminated this information at its monthly "FA Meetings" and "Homeroom Meetings."

89.    DaVita, through its management and administration, also threatened employees along these lines in one-on-one conversations with employees.

90.    In order to induce employees to remain with DaVita and not transfer to any of DaVita's competitors, DaVita is now offering signing bonuses if employees sign a non-compete agreement and restrictive covenant.

91.    Prior to IHS' expansion in the Markets, DaVita had not required all of its employees to sign non-compete agreements and restrictive covenants as a condition to their employment.

92.    DaVita's actions in this regard has impeded IHS' efforts to enter certain markets, including the Quincy, South Shore, and the southern part of the Boston, Massachusetts metropolitan area.

93.    Specifically, the Quincy Center met substantial barriers to entry, and continues to battle these predatory barriers, based on DaVita's conduct referenced above.

94.    DaVita also issued stock options in lieu of bonuses to qualifying FAs.

-16-

95.     DaVita, however, unbeknownst to the FAs, conditioned receipt of those stock options on the employee agreeing to a non-compete and/or restrictive covenant.

96.     Upon learning that a former employee takes a position with a DaVita competitor, such as IHS, DaVita immediately revokes and rescinds the stock options earned and awarded to the employee as a bonus.

97.     For example, multiple employees of IHS, in the Markets, have lost their earned stock options after taking positions with IHS.

98.     In those instances, most, if not all, of these former DaVita and current IHS employees were unaware that there were any conditions to the stock options.

99.     DaVita's tactics of conditioning bonuses on non-competition principles is aimed solely at harming DaVita's competition by thinning the potential employee field for competitors and preventing competing In-Center Hemodialysis centers from obtaining staffing.

100.    DaVita's conduct is solely malicious and without any legitimate business justification.

101.    DaVita's inappropriate and predatory conduct has effectively and substantially excluded IHS and other actual and potential competitors from obtaining necessary staffing and outpatient dialysis services in the Markets or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

102.    As a result of DaVita's conduct, IHS has lost patients, lost revenue, and lost profits.

**Lawsuits And Threats Of Lawsuits By DaVita**

103.    DaVita has sued employees in a concerted effort to rid certain markets, including without limitation the defined geographic market above, where DaVita is present from competition.

104.    Upon information and belief, DaVita has sued competitors, referral sources, and medical directors in a concerted effort to rid certain markets, including without limitation the defined geographic market above, where DaVita is present from competition.

105.    A DaVita Senior Vice-President in the Northeast Region has stated that DaVita has tons of money and a lot of lawyers that DaVita can use to "wear people out."

106.    These strong arm tactics have been used on current and former DaVita employees.

107.    For example, former DaVita employees currently working for Plaintiffs in the defined markets were called by DaVita Regional Directors, Senior Vice-Presidents, Social Workers, Interim Directors, and Divisional Vice-Presidents, and threatened with lawsuits for alleged violations of non-compete agreements.

108.    Upon information and belief, DaVita has commenced litigation against its former employees within the defined markets above.

109.    In most, if not all, of these instances, the lawsuits against the former employees were baseless and an abject sham used solely to intimidate and threaten in an effort to prevent employee transfer of employment to IHS and other competitors in the Markets.

110.    This type of behavior – suing former employees – by DaVita is commonplace for DaVita as demonstrated by the barrage of meritless litigations DaVita has commenced nationally, including without limitation lawsuits (no less than three) in Colorado.

111.    As evidenced by the record in those litigations, the lawsuits were baseless under Colorado law and were utilized merely as an anticompetitive tactic to hold back a DaVita competitor's efforts to set up a competing facility in that market.

112.    Eventually, the lawsuits commenced by DaVita against former employees in Colorado were all dismissed with prejudice, without any monetary award to DaVita.

113.    Highlighting the baseless nature of those litigations, DaVita's Senior Vice-President in that market acknowledged that they DaVita "believed" the former, sued employees violated a contract and that something had to be done by DaVita to prevent other employees from "leaving [DaVita] for higher salaries…"

114.    As an additional example, as soon as a nephrology practice and group of former DaVita employees opened a competing dialysis center in Georgia, DaVita immediately sued that group claiming, *inter alia*, tortious interference with business relations, injurious falsehood, defamation, and breach of purchase agreement.  All of DaVita's claims are wholly baseless and aimed at limiting its competition through expensive and prolonged litigation practices.

115.    DaVita has taken similar litigious tactics across the country, including in Georgia, Arizona, and, upon information and belief, the Markets.

116.    DaVita's anticompetitive lawsuit tactics amount to a pattern in the defined market and, more so, nationally.

-19-

117.    Upon information and belief, DaVita has commenced similarly baseless lawsuits against former DaVita employees in the markets at issue in this lawsuit.

118.    DaVita has threatened to commence lawsuits against former DaVita employees in the markets at issue in this lawsuit.

119.    In other instances, DaVita has revoked and rescinded bonuses and stock-options issued to former DaVita employees who have gone to work for competitors such as Plaintiffs.

120.    Upon information and belief, DaVita has commenced lawsuits against insurance providers and third-party payors to obtain more favorable reimbursement rates.

121.    DaVita has threatened lawsuits against insurance providers and third-party payors to obtain more favorable reimbursement rates.

122.    DaVita has also sued and threatened to sue referral sources and nephrology practices if these parties did not refer patients to DaVita as outlined by DaVita's self-imposed requirements in the Markets.

123.    DaVita has threatened lawsuits against referral sources in the Markets if these parties do not send at least 80% of their referrals to DaVita.

124.    DaVita threatened lawsuits against referral sources, medical directors, and nephrology practices in the Markets if these parties did not meet certain goals established by DaVita related to the referral of private insurance patients to DaVita facilities.

125.    As a result of DaVita's conduct, IHS has lost patients, lost revenue, and lost profits.

**Physician and Other Referral Relationships**

126.    As alleged above, outpatient diagnostic imaging facilities, such as those operated by DaVita and IHS, are heavily dependent upon referrals of ESRD patients from nephrologists, other physicians, and other health care providers.  It is these referrals that give the facilities the patients and resulting revenues flow needed to successfully operate the facilities.

127.    In order to achieve or maintain their market, or in some cases, monopoly power in various local outpatient dialysis services markets throughout the country – including the markets in which IHS competes or currently is in the process of planning for or opening facilities – DaVita has entered into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources or other these referrals to lock-up a significant number of patient referrals on a long-term basis.

128.    Upon information and belief, DaVita has pressured and incentivized referral sources, such as nephrologists and hospitals, in the Markets to steer patients to DaVita over other competing facilities.

129.    Indeed, DaVita is currently the subject of three pending federal law enforcement agency investigations into inappropriate and potentially illegal practices in connection with their physician contracting practices.

130.    These investigations include a joint civil and criminal investigation commenced at least as early as March 2005 by the United States Attorney's Office, Eastern District of Missouri, into, among other things, DaVita's medical director and joint venture agreements.  According to DaVita's November 4, 2011 SEC Form 10-Q, "it is possible that criminal proceedings may be initiated against the Company in connection with this investigation."

-21-

131.     There also is a civil investigation commenced at least as early as May 2010 by the United States Department of Health and Human Services, Office of the Inspector General, into DaVita's financial relationships with physicians and joint venturers.

132.     And there is an investigation in connection with a grand jury proceeding commenced as early as August 2010 by the United States Attorney's Office, District of Colorado into, among other things, DaVita's financial relationships with physicians and joint venturers.

133.     DaVita has negotiated deals with physicians and other referral relationships where DaVita sets goals for the referral of 80% of patients to DaVita over competitors.

134.     DaVita has negotiated deals with physicians and other referral relationships where DaVita sets goals for the referral of a certain percentage of private insurance patients to DaVita over competitors.

135.     DaVita's exclusive, long-term, illegal, or predatory contracts or agreements have effectively frozen out IHS and other actual and potential competitors from the outpatient dialysis services market or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

136.     As a result of DaVita's conduct, Plaintiffs have lost patients, lost revenue, and lost profits.

**<u>Managed Care Company Relationships</u>**

137.     Revenues for outpatient dialysis facilities are substantially dependent on the facilities' ability to negotiate favorable contracts with the managed care companies possessing significant amounts of covered lives in the relevant local market.

2186339v.2

138.   Favorable contracts with managed care companies are important because managed care companies typically provide coverage for the first 33 months of a ESRD patient's course of outpatient dialysis treatment at rates significantly higher than those provided by the Medicare and Medicaid program.

139.   In order to achieve or maintain their market, or in some cases, monopoly power in various local outpatient dialysis services markets throughout the country – including the markets in which IHS competes or currently is in the process of planning for or opening facilities – DaVita has entered into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis.

140.   Upon information and belief, DaVita has entered in to agreements with managed care companies providing DaVita with a right of first refusal to add new In-Center Hemodialysis centers in the Markets to the managed care networks, and further adding that any new In-Center Hemodialysis centers that will be added to the managed care networks could only be added with DaVita's consent.

141.   Pressure exerted by DaVita on managed care companies in the Markets has effectively excluded IHS from treating these managed care companies' patients and limits and impedes the patients choice to transfer dialysis centers.

142.   Upon information and belief, DaVita's contracts with these managed care companies are the product of DaVita pressure and threats in the markets.

143.   DaVita's contracts with these managed care companies results in preferential treatment to DaVita centers, including without limitation, quicker reimbursement turn around, favorite reimbursement rates, and DaVita preferred status.

144.    DaVita's exclusive, long-term, illegal, or predatory contracts or agreements have effectively frozen out IHS and other actual and potential competitors from the outpatient dialysis services market or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

145.    As a result of DaVita's conduct, IHS has lost patients, lost revenue, and lost profits.

**Pharmaceutical Company Relationships**

146.    A major item of expense for outpatient diagnostic imaging facilities is pharmaceutical product expense.  Outpatient dialysis treatments consume a significant amount of expensive pharmaceutical products.  Additionally, the generally poor medical condition of ESRD patients require them to receive a substantial amount of expensive medications.  And, since, under Medicare and Medicaid reimbursement rules, certain pharmaceutical products are reimbursed separately from the underlying treatment, these products can be a separate source of substantial reimbursement.

147.    In order to achieve or maintain their market, or in some cases, monopoly power in various local outpatient dialysis services markets throughout the country – including the markets in which IHS competes or currently is in the process of planning for or opening facilities – DaVita has entered into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers.

-24-

148.    Indeed, DaVita is currently the subject of three pending federal law enforcement agency investigations into inappropriate and potentially illegal practices in connection with their purchasing of reimbursement for pharmaceutical products.

149.    For example, DaVita has put pressure on its pharmaceutical supplies to cut rates, for first priority, and preferential treatment.

150.    Senior management at DaVita has remarked that DaVita can put pressure on drug supply companies to have them "see the light."

151.    In particular, DaVita has exclusive "sole sourcing" agreements with Amgen, Inc.

152.    Upon information and belief, DaVita pressured and threatened Amgen, Inc. to provide DaVita with lower rates, first priority in the Markets, and preferential treatment over other competitors in the Markets.

153.    DaVita also has an exclusive agreement with F. Hoffman-La Roche Ltd.

154.    Upon information and belief, DaVita pressured and threatened F. Hoffman-La Roche Ltd. to provide DaVita with lower rates, first priority in the Markets, and preferential treatment over other competitors in the Markets.

155.    DaVita's exclusive, long-term, illegal, or predatory contracts or agreements have effectively and substantially raised the cost of doing business of IHS and other actual and potential competitors from the outpatient dialysis services market or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

156.    As a result of DaVita's conduct, IHS has lost patients, lost revenue, and lost profits.

**Warehousing Space and Licenses**

157.    As alleged above, significant barriers to entry into the outpatient dialysis services market include the need to outfit suitable premises to operate a compliant outpatient dialysis facility and the need to obtain a license from the appropriate state authorities to lawfully operate the facility.

158.    Locating and outfitting appropriate space often is difficult and very expensive because of the need to comply with stringent life, health, and safety codes, the need for sufficient space to install the necessary equipment, and the special requirements relating to ventilation, electricity and water supply.

159.    Likewise, obtaining a license from the appropriate state authorities often is difficult because of the need to comply with a multitude of state and local regulatory and oftentimes certificate of need requirements.

160.    As a result, frequently the best way to enter a local market for dialysis services providers is to acquire an existing facility and license as the space and regulatory issues have been resolved.

161.    In order to achieve or maintain their market, or in some cases, monopoly power in various local outpatient dialysis services markets throughout the country – including the markets in which IHS competes or currently is in the process of planning for or opening facilities – DaVita has inappropriately and without legitimate business justification warehoused space and licenses so as to prevent other potential competitors from entering the local market.

162.   DaVita's warehousing of space and licenses has effectively and substantially excluded IHS and other actual and potential competitors from the outpatient dialysis services market or, at the very least, substantially impaired their ability to compete and thereby preserved or resulted in DaVita having market or monopoly power.

163.   As a result of DaVita's conduct, Plaintiffs have lost patients, lost revenue, and lost profits.

**DaVita's Use Of Exclusivity In The HHD Market**

164.   The demand for HHD in the Markets is growing.

165.   Based on reimbursement rates and rules for this growing practice area, HHD programs are attractive to In-Center Hemodialysis centers as they may yield a greater financial profit.

166.   As such, DaVita has placed an importance on growing their HHD and PD practice.

167.   As a general rule, HHD patients are a more profitable, commercially-insured patient base because such patients are typically younger and working.

168.   In 2007, DaVita entered in to a contract with NxStage, Inc. ("NxStage") – a separate company – in which DaVita purchased a minority stock interest in NxStage.

169.   Among other things, DaVita's contract(s) with NxStage gives DaVita certain exclusive rights to utilize NxStage machines in the Markets.

170.   This exclusivity is of importance to DaVita and gave DaVita favored, exclusive access to chronic ESRD patients who dialyzed with DaVita's competitors in the Markets.

171.    At the present, the NxStage machine utilized in HHD is the preferred equipment and there are not other reasonably comparable alternatives.

172.    Upon information and belief, DaVita has taken steps to maintain its exclusivity with NxStage as a means of retaining DaVita's patient base and excluding Plaintiffs' from the HHD patients in the Markets.

173.    There is no reasonable business justification for such exclusionary practices and efforts by DaVita, which practices and efforts constitute unreasonable restraint of trade, and which acts adversely affect ESRD patients and limit ESRD patients' choices of treatment, and hinders IHS' ability to participate in the Markets.

174.    DaVita's exclusivity with NxStage – as well as other vendors – was an intentional effort by DaVita to discourage and prevent ESRD HHD patients from receiving treatment at competing In-Center Hemodialysis centers, including Plaintiffs, and therefore has the purpose and effect of unlawfully impairing competition and injuring smaller rivals, such as IHS.

175.    As a result of DaVita's conduct, Plaintiffs have lost patients, lost revenue, and lost profits.

## FIRST CAUSE OF ACTION

176.    Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

177.    DaVita has monopoly power in the local markets for provision of outpatient dialysis services in which IHS currently competes or is planning to enter.

178.    DaVita has engaged in exclusionary conduct designed to maintain and further its monopoly power.

179.   This exclusionary conduct includes, but is not limited to:   (a) entering into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources to lock-up a significant number of patient referrals on a long-term basis; (b) entering into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis; (c) entering into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers; (d) inappropriately and without legitimate business justification warehousing space and licenses so as to prevent other potential competitors from entering the local market.; and (e) engaging inappropriate and predatory business conduct designed to prevent the potential new entrants to gain any foothold in the market.

180.   By reason of the foregoing, DaVita has violated 15 U.S.C. § 2.

181.   By reason of the conduct of DaVita, Plaintiffs have been, and continue to be, substantially and directly injured in their business and property in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

182.   Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

183.   DaVita has engaged in exclusionary conduct designed to achieve, maintain, and further monopoly power.

-29-

184.   This exclusionary conduct includes, but is not limited to:   (a) entering into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources to lock-up a significant number of patient referrals on a long-term basis; (b) entering into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis; (c) entering into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers; (d) inappropriately and without legitimate business justification warehousing space and licenses so as to prevent other potential competitors from entering the local market; and (e) engaging inappropriate and predatory business conduct designed to prevent the potential new entrants to gain any foothold in the market.

185.   DaVita engaged in this conduct with a specific intent to monopolize, as demonstrated and indicated by its illegal, improper, and predatory conduct directed towards Plaintiffs and other actual and potential competitors.

186.   DaVita has a dangerous probability of attaining monopoly power in the local markets for provision of outpatient dialysis services in which Plaintiffs compete.

187.   By reason of the foregoing, DaVita has violated 15 U.S.C. § 2.

188.   By reason of the conduct of DaVita, Plaintiffs have been, and continue to be, substantially and directly injured in their business and property in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

189.    Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

190.    DaVita has entered into agreements with physicians and other referral sources, managed care companies, pharmaceutical manufacturers, landlords, and others, the intent, effect, and purpose of which was to monopolize the local markets for outpatient dialysis services in which Plaintiffs compete.

191.    DaVita has undertaken a series of overt acts in furtherance of the conspiracy, including, but not limited to:   (a) entering into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources to lock-up a significant number of patient referrals on a long-term basis; (b) entering into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis; (c) entering into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers; (d) inappropriately and without legitimate business justification warehousing space and licenses so as to prevent other potential competitors from entering the local market; and (e) engaging in inappropriate and predatory business conduct designed to prevent the potential new entrants to gain any foothold in the market.

192.    DaVita engaged in this conduct with a specific intent to monopolize, as demonstrated and indicated by its illegal, improper, and predatory conduct directed towards Plaintiffs and other actual and potential competitors.

-31-

193.    By reason of the foregoing, DaVita has violated 15 U.S.C. § 2.

194.    By reason of the conduct of DaVita, Plaintiffs have been, and continue to be, substantially and directly injured in their business and property in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

195.    Plaintiffs repeat and re-allege the allegations set forth above as if more fully set forth herein.

196.    DaVita has entered into contracts, combinations, or conspiracies with physicians and other referral sources, managed care companies, pharmaceutical manufacturers, landlords, and others the intent, effect, and purpose of which was to unlawfully and unreasonably restrain trade in the local markets for outpatient dialysis services in which Plaintiffs compete.

197.    In furtherance of these conspiracies, DaVita has unreasonably restrained trade by, among other things, (a) entering into exclusive, long-term, illegal, or predatory contracts or agreements with nephrologists and other referral sources to lock-up a significant number of patient referrals on a long-term basis; (b) entering into exclusive, long-term, illegal, or predatory contracts or agreements with managed care companies to lock-up a significant number of covered lives on a long-term basis; (c) entering into exclusive, long-term, illegal, or predatory contracts or agreements with pharmaceutical companies to give them needed pharmaceutical products at extremely favorable and, in some cases, predatory pricing that is not available to IHS or other competing outpatient dialysis services providers; (d) inappropriately and without legitimate business justification warehousing space and licenses so as to prevent other potential competitors from entering the local market; and (e) engaging in inappropriate and predatory

business conduct designed to prevent the potential new entrants to gain any foothold in the market.

198.   DaVita's conduct has caused significant anticompetitive effects in the relevant markets including, but not limited to, the exclusion of competitors, pricing above competitive levels, output below competitive levels, and predatory pricing.  These anticompetitive effects far outweigh any precompetitive benefits potentially flowing from the conduct.

199.   By reason of the foregoing, DaVita has violated 15 U.S.C. § 1.

200.   By reason of the conduct of DaVita, Plaintiffs have been, and continue to be, substantially and directly injured in their business and property in an amount to be determined at trial.

\*           \*           \*

-33-

## **DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against the Defendant for three times the amount that Plaintiffs have been injured in their business and property by reason of DaVita's conduct, together with the costs of suit, including attorneys' fees, and such other relief that the Court deems appropriate.

Dated: Great Neck, New York           GARFUNKEL WILD, P.C.
       June 25, 2012                    *Attorneys for Plaintiffs*

                                          By:

                                    */s/ Roy W. Breitenbach*
                                         Roy W. Breitenbach
                                         Kevin Donoghue
                      111 Great Neck Road
                      Great Neck, New York  11021
                      (516) 393-2200

2186339v.2