# GARFUNKEL WILD, P.C.

### ATTORNEYS AT LAW

111 GREAT NECK ROAD • GREAT NECK, NEW YORK 11021
TEL (516) 393-2200 • FAX (516) 466-5964
www.garfunkelwild.com

KEVIN G. DONOGHUE
Partner
Email:  kdonoghue@garfunkelwild.com
Direct Dial:  (516) 393-2535

FILE NO.:    12949.0009

**By ECF**                                                         June 5, 2015

The Honorable Lisa Margaret Smith
United States Magistrate Judge, Southern District of New York
300 Quarropas Street, Courtroom 520
White Plains, New York 10601

Re:    *IHS Dialysis, Inc. et. al. v. DaVita Inc.* Docket No. 12-cv-2468 (Undue Burden)

Dear Magistrate Judge Smith:

At the parties' May 27, 2015 conference, DaVita requested the opportunity to submit an additional submission to discuss the burden of producing documents in response to IHS Document Request No. 39.[1]   DaVita's claim of burden is merely a desperate attempt to avoid disclosure of relevant documents.  Notably, DaVita never claimed any undue burden in responding to Request No. 39 in its May 22, 2015 opposition letter brief to the Court, in letters between counsel, or during the parties meet and confers regarding this dispute.  To indulge this argument of alleged burden now would only reward DaVita for its decision to withhold production of these relevant, responsive documents.  DaVita created this issue by withholding such production.   Indeed, the only reason that DaVita may incur any additional costs in production of this material is because DaVita failed to include it as part of its initial document review and production.

---

[1]     At the parties' last conference, DaVita requested permission to file one submission concerning both the alleged linkage and this issue of purported burden.  It was inappropriate for DaVita to makes two submissions without discussing with the Court or with IHS.  However, since DaVita made two submission IHS has accordingly responded in the same manner.

---

The Honorable Lisa Margaret Smith
June 5, 2015
Page 2

**Since The Allegations In The Government Investigation Are Similar To The**
**Second Amended Complaint The Relevance Of These Documents Outweigh The Burden**

As discussed in IHS's Motion to Compel Letter [Doc. No. 106.], this governmental investigation is central to IHS's lawsuit.   The DOJ investigation concerned allegations that DaVita "ensured referrals of . . . patients to the clinics through a series of secondary agreements with the physicians, including entering into agreements in which the physician agreed not to compete with the DaVita clinic and non-disparagement agreements that would have prevented the physicians from referring their patients to other dialysis providers." *See* Exh. 1.   The alleged illegal actions took place from 2005-2014, which is the relevant time period for this lawsuit.   *See id*.   There is no legitimate dispute that this is the type of "anticompetitive behavior" that the Court ordered DaVita to produce in response to IHS Request No. 39.

In fact, the allegations in IHS's complaint are extremely similar to the allegations in the DOJ investigation.  For example, paragraphs 96 and 97 of the complaint state:

> DaVita fraudulently ensures that it will receive the referrals from a physician or group to whom it pays kickbacks by requiring them to execute Medical Director Agreements with non-competition provisions. Through these contracts, DaVita ensures that the physicians will have no ownership interest in any other dialysis center during their tenure as Medical Director at the DaVita center (usually ten years) – and thus will have no financial incentive to send referrals to any other center.
>
> The critical role these non-competition agreements, and their corresponding implicit guarantee of referrals

*See* Exh. 2.  IHS made almost the same allegations in the Second Amended Complaint.  *See* ¶¶ 118-124 [Dkt No. 26].  The fact that DaVita still argues that this investigation is not relevant is illogical.   Monopolization is the acquisition of a monopoly through anticompetitive and/or

The Honorable Lisa Margaret Smith
June 5, 2015
Page 3

exclusionary means.  Here, the illegal acquisition of patients through exclusionary arrangements

is the acquisition of a monopoly through anticompetitive behavior.

**The Relevance Of The Government Investigation Is Not**
**Minimal Because The Investigation Concerned The Relevant Markets**

Next, DaVita argues that the investigation did not concern the Relevant Markets.  This is

irrelevant.  Your Honor already held that Request No. 39 should not be limited to the Relevant

Markets.  *See* February 6, 2015 Transcript p. 91.  This ruling should not be disturbed and this

argument should hold no weight.

Additionally, DaVita fails to reference that the government's investigation of DaVita did

capture the Relevant Markets.  In the government investigation there are allegations of improper

actions in New York.  Specifically, Count 10 of the Complaint references violations of New

York law and paragraph 124 of the government complaint references illegal acquisitions by

DaVita in New York.  *See* Exh. 2.

Further, DaVita's document production establishes that they were active with joint

ventures in the Relevant Markets.  For example, DaVita had and/or investigated joint ventures in

the Relevant Markets in Bedford Park, Yonkers, Bronx Blvd, Queens North, and Brookline

(DVAFED0153615, 014895, 0148082, and 224963).  Furthermore, DaVita admits it had a joint

venture with IHS in the Relevant Market.  Any government investigation, like the one here,

concerning DaVita's relationship with IHS is most certainly discoverable and relevant to this

lawsuit.  Accordingly, the documentary evidence does not support DaVita's argument that the

documents concerning the government investigation will produce documents of little relevance.

**DaVita Has Significantly Over Estimated The Burden**

DaVita claims that this investigation will cost over $4 million.  It is respectfully

GARFUNKEL WILD, P.C.

The Honorable Lisa Margaret Smith
June 5, 2015
Page 4

submitted that these conclusory predictions are overinflated just for the "shock and awe" value and in an effort to block the production of relevant documents that IHS was entitled to receive months ago. Such inflated estimates should hold no weight with the Court. *See Spieker v. Quest Cherokee, LLC*, No. 07 Civ. 1225, 2009 WL 2168892, at *4 (D. Kan. July 21, 2009) ("[C]ourt ... not persuaded that defendant has carried its burden of showing that the discovery is not reasonably accessible because of undue burden or cost" as "defendant's cost estimates are greatly exaggerated in an attempt to fall within the parameters of Rule 26(b)(2)(B).") (internal quotes omitted); *Mikron Indus., Inc. v. Hurd Windows & Doors, Inc.*, No. 07 Civ. 532, 2008 WL 1805727, at *2 (W.D. Wash. April 21, 2008) ("[D]efendants offer little evidence beyond a cost estimate and conclusory characterizations of their ESI as 'inaccessible.' ").

Here, DaVita's prediction lacks credibility for a few reasons. First, DaVita represented when it was in Court that it believed that the production would cost $3 million – an inflated figure in and of itself. Then, only days later, that inflated estimate increased another $1 million to the present amount of $4 million. Second, DaVita's estimate for this production is supposedly in excess of what DaVita has previously advised it has spent in connection with all documentary discovery to date in this matter. Third, DaVita's quoted amount here is incredible because DaVita's prediction of this production assumes that all the same work as the main production in this litigation would have to be done. This is not true. For example, the documents will not have to be reviewed for relevance because all documents turned over to the government are relevant, which would significantly decrease attorney review time. Additionally, DaVita fails to mention that the 281,000 documents that were turned over to the government have already been collected. DaVita attempts to inflate it's price prediction by having the Court believe it will have to recollect every document that was produced to the government. This is false. While DaVita

GARFUNKEL WILD, P.C.

The Honorable Lisa Margaret Smith
June 5, 2015
Page 5

may possibly have to do a confidentiality review, this is not nearly as burdensome as a relevance review. Yet, DaVita's quote disingenuously includes both reviews.

DaVita also argues that it will have to do a privilege review in this matter because there is a non-waiver privilege agreement. However, DaVita fails to mention that the parties in this case have a similar provision. Specifically, pursuant to the parties Protective Order the parties agreed and Your Honor So-Ordered:

> If a Party at any time notifies any other Party that it inadvertently produced documents, testimony, … protected from disclosure under the attorney-client privilege, work product doctrine, and/or any other applicable privilege …, **the inadvertent production shall not be deemed a waiver of the applicable privilege or protection**.

Exh. 3, ¶ 12. Plainly, since the government investigation was a full blown litigation, IHS finds it hard to believe that the non-waiver privilege agreement is different than the one in this case and DaVita has failed to show otherwise. Additionally, it is also unbelievable that a privilege review was not already done before the documents were turned over to the government. It makes little sense DaVita would turn over privileged documents to the government.

Most importantly, it should not be forgotten that DaVita created this very situation by their own duplicitous maneuvering in this case and by DaVita's decisions to withhold production of these plainly relevant and responsive documents. IHS made clear at the February 6, 2014 conference that it was aware of and looking for production of documents concerning all investigations including this one. The Court ordered production of such documents over DaVita's objections. In response, DaVita decided to ignore the Court's Order in that regard and withheld these documents. Now, with unclean hands, DaVita asks to allow its unilateral decision to ignore the Court's rulings due to a claim of burden. That is simply unfair and respectfully should not be countenanced, as DaVita should have produced these documents at the outset.

GARFUNKEL WILD, P.C.

The Honorable Lisa Margaret Smith
June 5, 2015
Page 6

Very truly yours,

*Kevin G. Donoghue*

Kevin G. Donoghue

**GARFUNKEL WILD, P.C.**

# Exhibit 1

6/5/2015
Case 1:12-cv-02468-ER-LMS  Document 112  Filed 06/05/15  Page 8 of 96
DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks | OPA | Department of Justice

# JUSTICE NEWS

## Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Wednesday, October 22, 2014

### DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks

DaVita Healthcare Partners, Inc., one of the leading providers of dialysis services in the United States, has agreed to pay $350 million to resolve claims that it violated the False Claims Act by paying kickbacks to induce the referral of patients to its dialysis clinics, the Justice Department announced today. DaVita is headquartered in Denver, Colorado and has dialysis clinics in 46 states and the District of Columbia.

The settlement today resolves allegations that, between March 1, 2005 and February 1, 2014, DaVita identified physicians or physician groups that had significant patient populations suffering renal disease and offered them lucrative opportunities to partner with DaVita by acquiring and/or selling an interest in dialysis clinics to which their patients would be referred for dialysis treatment. DaVita further ensured referrals of these patients to the clinics through a series of secondary agreements with the physicians, including  entering into agreements in which the physician agreed not to compete with the DaVita clinic and non-disparagement agreements that would have prevented the physicians from referring their patients to other dialysis providers.

"Health care providers should generate business by offering their patients superior quality services or more convenient options, not by entering into contractual agreements designed to induce physicians to provide referrals," said Deputy Assistant Attorney General for the Justice Department's Civil Division Jonathan F. Olin. "The Justice Department is committed to protecting the integrity of our healthcare system and ensuring that financial arrangements in the healthcare marketplace comply with the law."

The government alleged that DaVita used a three part joint venture business model to induce patient referrals. First, using information gathered from numerous sources, DaVita identified physicians or physician groups that had significant patient populations suffering renal disease within a specific geographic area. DaVita would then gather specific information about the physicians or physician group to determine if they would be a "winning practice." In one transaction, a physician's group was considered a "winning practice" because the physicians were "young and in debt."  Based on this careful vetting process, DaVita knew and expected that many, if not most, of the physicians' patients would be referred to the joint venture dialysis clinics.

Next, DaVita would offer the targeted physician or physician group a lucrative opportunity to enter into a joint venture involving DaVita's acquisition of an interest in dialysis clinics owned by the physicians, and/or DaVita's sale of an interest in its dialysis clinics to the physicians. To make the transaction financially attractive to potential physician partners, DaVita would manipulate the financial models used to value the transaction.  For example, to decrease the apparent value of clinics it was selling, DaVita would employ an assumption it referred to as the "HIPPER compression," which was based on a speculative and arbitrary projection that future payments for dialysis treatments by commercial insurance companies would be cut by as much as half in future years. These manipulations resulted in physicians paying less for their interest in the joint ventures and realizing returns on investment which were extraordinarily high, with pre-tax annual returns exceeding 100 percent in some instances.

Last, DaVita ensured future patient referrals through a series of secondary agreements with their physician

partners. These included paying the physicians to serve as medical directors of the joint venture clinics, and entering into agreements in which the physicians agreed not to compete with the clinic. The non-compete agreements were structured so that they bound all physicians in a practice group, even if some of the physicians were not part of the joint venture arrangements. These agreements also included provisions prohibiting the physician partners from inducing or advising a patient to seek treatment at a competing dialysis clinic. These agreements were of such importance to DaVita that it would not conclude a joint venture transaction without them.

The Government's complaint identifies a joint venture with a physicians' group in central Florida as one of several examples illustrating DaVita's scheme to improperly induce patient referrals. The group had previously been in a joint venture arrangement involving dialysis clinics with Gambro, Inc., a dialysis company acquired by DaVita in 2005. Prior to the acquisition, Gambro had entered into a settlement with the United States to resolve alleged kickback allegations that, among other things, required Gambro to unwind its joint venture agreements. As a consequence, Gambro purchased the group's interest in the joint venture clinics and agreed to a "carve-out" of the associated non-competition agreement which allowed the group to open its own dialysis clinic nearby, which it did. After acquiring Gambro, DaVita bought a majority position in the group's newly established dialysis clinic, and sold a minority position in three DaVita-owned clinics. Despite the fact that each of the clinics involved were roughly comparable in terms of size and profits, DaVita agreed to pay $5,975,000 to acquire a 60 percent interest in the group's clinic, while selling a 40 percent interest in the three clinics it owned for a total of $3,075,000. As part of this joint venture, the group agreed to enter into new non-compete agreements.

"This case involved a sophisticated scheme to compensate doctors illegally for referring patients to DaVita's dialysis centers.   Federal law protects patients by making buying and selling patient referrals illegal, so as to ensure that the interest of the patient is the exclusive factor in the referral decision," said U.S. Attorney John Walsh.  "When a company pays doctors and/or their practice groups for patient referrals, the company's focus is not on the patient, but on the profit to be extracted from providing services to the patient."

In conjunction with today's announcement, the U.S. Attorney's Office noted that after extensive review, it is closing its criminal investigation of two specific joint ventures.

As part of the settlement announced today, DaVita has also agreed to a Civil Forfeiture in the amount of $39 million based upon conduct related to two specific joint venture transactions entered into in Denver, Colorado. Additionally, DaVita has entered into a Corporate Integrity Agreement with the Office of Counsel to the Inspector General of the Department of Health and Human Services which requires it to unwind some of its business arrangements and restructure others, and includes the appointment of an Independent Monitor to prospectively review DaVita's arrangements with nephrologists and other health care providers for compliance with the Anti-Kickback Statute.

"Companies seeking to boost profits by paying physician kickbacks for patient referrals – as the government contended in this case – undermine impartial medical judgment at the expense of patients and taxpayers," said Daniel R. Levinson, Inspector General for the U.S. Department of Health and Human Services.  "Expect significant settlements and our continued investigation of such wasteful business arrangements."

The settlement resolves allegations originally brought in a lawsuit filed under the qui tam or whistleblower provisions of the False Claims Act, which allow private parties to bring suit on behalf of the government and to share in any recovery.  The suit was filed by David Barbetta, who was previously employed by DaVita as a Senior Financial Analyst in DaVita's Mergers and Acquisitions Department. Mr. Barbetta's share of the recovery has yet to be determined.

This settlement illustrates the government's emphasis on combating health care fraud and marks another achievement for the Health Care Fraud Prevention and Enforcement Action Team (HEAT) initiative, which was

announced in May 2009 by the Attorney General and the Secretary of Health and Human Services. The partnership between the two departments has focused efforts to reduce and prevent Medicare and Medicaid financial fraud through enhanced cooperation. One of the most powerful tools in this effort is the False Claims Act. Since January 2009, the Justice Department has recovered a total of more than $22.4 billion through False Claims Act cases, with more than $14.2 billion of that amount recovered in cases involving fraud against federal health care programs.

The case was handled by the United States Attorney's Office for the District of Colorado, the Civil Division of the United States Department of Justice, and the U.S. Department of Health and Human Services, Office of Inspector General.

The lawsuit is captioned *United States ex rel. David Barbetta v. DaVita, Inc. et al.*, No. 09-cv-02175-WJM-KMT (D. Colo.). The claims settled by this agreement are allegations only; there has been no determination of liability.

14-1167

<u>Civil Division</u>

*Updated October 22, 2014*

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| [UNDER SEAL], | ) | Case No. |
| | ) | |
| Plaintiffs, | ) | COMPLAINT |
| | ) | |
| vs. | ) | |
| | ) | |
| [UNDER SEAL], | ) | **FILED IN CAMERA AND UNDER SEAL** |
| | ) | **PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | ) | |
| | ) | |

**DOCUMENT TO BE KEPT UNDER SEAL**

CROSS & BENNETT LLC
KEITH CROSS (CO State Bar No. 8934)
KCross@CrossBennett.com
108 E. St. Vrain, Suite #20
Colorado Springs, CO 80903
Tel.: (719) 633-1359
Fax: (719) 633-5788

PHILLIPS & COHEN LLP
ERIC R. HAVIAN (CA State Bar No. 102295)
erh@pcsf.com
CLAIRE M. SYLVIA (CA State Bar No. 138990)
cms@pcsf.com
JESSICA T. MOORE (CA State Bar No. 183431)
jtm@pcsf.com
131 Steuart Street, Suite 501
San Francisco, California 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for [under seal]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MICHIGAN, NEVADA, NEW YORK, OKLAHOMA, TENNESSEE, TEXAS, VIRGINIA, and WISCONSIN, ex rel. DAVID BARBETTA,<br><br>Plaintiffs,<br><br>vs.<br><br>DEFENDANTS DAVITA, INC. and TOTAL RENAL CARE, INC.,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 et seq.]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt. Code §12650 et seq.]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 et seq.]; GEORGIA FALSE MEDICAID CLAIMS ACT [Ga. Code Ann. §49-4-168 et seq.]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat. §175 et seq.]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [Ind. Code Ann. §5-11-5.5-1 et seq.]; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. Rev. Stat. §437 et seq.]; MICHIGAN MEDICAID FALSE CLAIMS ACT [Mich. Comp. Laws. §400.601 et seq.]; NEVADA FALSE CLAIMS ACT [Nev. Rev. Stat. Ann. §357.010 et seq.]; NEW YORK |

FALSE CLAIMS ACT [N.Y. State Fin. §187 et seq.]; OKLAHOMA MEDICAID FALSE CLAIMS ACT [Okla. Stat. tit. 63 §5053 et seq.]; TENNESSEE FALSE CLAIMS ACT AND TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §4-18-101 et seq. and §71-5-181 et seq.] TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann. §36.001 et seq.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code Ann §8.01-216.1 et seq.]; and WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT [Wis. Stat §20.931 et seq.]

**JURY TRIAL DEMANDED**

**(FILED IN CAMERA AND UNDER SEAL)**

Plaintiff-Relator David Barbetta ("Relator"), through his attorneys Phillips & Cohen LLP and Cross & Bennett LLC, on behalf of the United States of America, the States of California, Florida, Georgia, Illinois, Indiana, Louisiana, Michigan, Nevada, New York, Oklahoma, Tennessee, Texas, Wisconsin, and the Commonwealth of Virginia (collectively "the Plaintiff States"), for his Complaint against defendants DaVita, Inc. and Total Renal Care, Inc.

(collectively "DaVita" or "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the Plaintiff States arising from false and/or fraudulent statements, records, and claims made and caused to be made by defendants and/or their agents, employees and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§3729 et seq. (the "Act" or "FCA"), and the false claims acts of the Plaintiff States.

2.     DaVita has engaged in a nationwide scheme to illegally induce physicians to refer, recommend and otherwise influence their patients to go to DaVita-owned dialysis centers to receive treatment for End Stage Renal Disease.

3.     DaVita owns dialysis centers across the country, both by itself and in joint ventures with physician groups.  DaVita induces physicians to refer business to its facilities, and rewards monetarily those that provide such referrals by: (a) selling them shares in existing DaVita dialysis centers for below-market rates; (b) buying shares in dialysis centers owned by physicians for above-market rates; (c) giving physicians kickbacks masked as profits from joint ventures; and (d) paying physicians to refrain from building competing dialysis centers.

4.     DaVita has violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b(b), by providing these inducements to physicians.  The AKS is designed to ensure that physicians make clinical decisions based upon informed, impartial medical judgment – judgment unaffected by personal financial motives.  DaVita has knowingly and routinely violated that fundamental principle – corrupting the medical judgment of physicians across the country by giving them what one DaVita manager described as "a bag of money" to obtain

referrals of the physicians' patients.

5.    Any claims submitted either by DaVita or the physicians for services tainted by these illegal kickbacks are ineligible for reimbursement by the Medicare Program, Medicaid Program, or other federal or state-funded health care programs. Defendants have submitted, or caused others to submit, such kickback-tainted claims. As a consequence, the United States and the Plaintiff States have been damaged in significant amount.

6.    Defendants' conduct alleged herein violates the federal False Claims Act and False Claims Acts of the Plaintiff States. The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986 – and, again, in May 2009 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

7.    The FCA prohibits: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) conspiring to violate any of these provisions. 31 U.S.C. §§3729(a)(1)(A)-(C). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United

States. 31 U.S.C. §3729(a)(1).

8.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

9.     As set forth below, Defendants' actions alleged in this Complaint also violate the California False Claims Act, Cal. Govt. Code §12650 et seq.; the Florida False Claims Act, Fla. Stat. Ann. §68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/1-8; the Indiana False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.5 et seq.; the Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. §46:437.1 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws. §400.601 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.010 et seq.; the New York False Claims Act, N.Y. State Fin. §187 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 et seq.; the Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §4-18-101 et seq. and §71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 et seq.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat §20.931 et seq.

10.     Based on these provisions, qui tam plaintiff and relator David Barbetta seeks to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged herein.

5

## II.   PARTIES

11.     Plaintiff/Relator David Barbetta is a citizen of California.  Mr. Barbetta is a CFA Charterholder.  He worked for DaVita from April 2007 until July 2009 as a Senior Financial Analyst in the Mergers and Acquisitions department, known within DaVita as "Deal Depot." DaVita's Deal Depot is responsible for buying and selling shares in dialysis centers and dialysis-related joint ventures.  Mr. Barbetta's responsibilities included using the economic models developed by DaVita for determining values of dialysis centers and joint ventures.  Mr. Barbetta currently works as a Software Engineer Consultant at Barclay's Global Investors in San Francisco, California.

12.     Defendant DaVita, Inc. is a Delaware corporation with its corporate headquarters located at 1627 Cole Blvd., Lakewood, CO 80401.  Prior to 2009, DaVita's home offices were located at 601 Hawaii Street, El Segundo, California 90245.

13.     According to its most recent annual report, DaVita is a leading provider of dialysis services in the United States for patients suffering from chronic kidney failure, also known as end stage renal disease, or ESRD.  As of December 31, 2008, DaVita operated or provided administrative services to 1,449 outpatient dialysis centers located in 43 states and the District of Columbia, serving approximately 112,000 patients.  DaVita also provides acute inpatient dialysis services in approximately 700 hospitals and related laboratory services.  Its dialysis and related lab services business accounts for approximately 96% of its consolidated revenues.  Ex. 1 at 2, incorporated herein.  Hereinafter, all Exhibits referenced in this Complaint are incorporated herein.

14.     Total Renal Care, Inc. ("TRC") is a California corporation and a wholly-owned subsidiary of DaVita, Inc.  DaVita uses TRC and other subsidiaries to buy, sell and hold interests

in various dialysis centers and dialysis-related joint ventures.

## III.  JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.  In addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the State-law claims.

16.     Under 31 U.S.C. §3730(e), and under the comparable provisions of the Plaintiff State statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator, moreover, would qualify under those sections as an "original source" of the information in this Complaint even had such a public disclosure occurred.

17.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a), which authorizes nationwide service of process and because the Defendants have minimum contacts with the United States, and can be found in and/or transact business in this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and 1395(a) and 31 U.S.C. §3732(a) because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District.  Defendant maintains its corporate headquarters in this District.  In addition, statutory violations, as alleged herein, occurred in this District.

## IV. FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS

### A. Medicare

19. Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

20. The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

21. Medicare provides benefits for patients with End Stage Renal Disease under Parts A and B. Individuals otherwise ineligible for Medicare, become eligible when they develop ESRD.

22. Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury." Social Security Act §1862(a)(1)(A). Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. §1320c-5(a).

23. The Medicare program is administered through the Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS").

**B.    Medicaid**

24.    Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the federal Government and those states participating in the program. Thus, under Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.

25.    Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary"). After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. §1396b(a)(1).

26.    Individuals may be "dual eligible" for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

**C.    Other Federal and State-Funded Health Care Programs**

27.    The federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

28.    TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

29.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

30.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

31.     The Plaintiff States provide health care benefits to certain individuals, based either on the person's financial need, employment status or other factors.  To the extent those programs are covered by that State's False Claims Act, those programs are referred to in this Complaint as "state-funded health care programs."

## V.     APPLICABLE LAW

### A.     The Federal Anti-Kickback Statute Prohibits Dialysis Centers From Offering Financial Incentives To Induce Physicians To Refer Their Patients to the Center

32.     The federal health care Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

33.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. §1320a-7b(b).

34.     The AKS defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1).  In addition to the more obvious types of remuneration (e.g.,

cash payments, gifts of cars, free vacations, etc.), the statute also prohibits less direct forms of payment such as providing items or services (such as an opportunity to buy into a joint venture) at less than market value, or investment arrangements where the referring provider has a substantial financial interest in referring his or her patients to the joint venture.

35.     The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") is responsible for issuing regulations and guidance interpreting the AKS.  In this capacity, HHS OIG has expressed particular concern that at least three types of transactions at issue in this case have a strong likelihood of violating the AKS and thus should be subject to heightened scrutiny: (a) compensation to referring physicians embedded in excessive payments for the purchase of the physicians' practice by an entity who is in a position to receive ongoing referrals from the physician; (b) compensation in the form of payments for non-competition agreements; and (c) joint ventures and other investment arrangements where a referring-physician owns part of an entity to which he or she refers patients.

       1.    **Excessive Payments for Physician Practices and Other Physician Assets**

36.     HHS OIG has specifically expressed concern about the purchase of a physician practice or other similar entity in a position to make referrals by an entity that receives referrals from that practice.  In a December 22, 1992 Opinion Letter, the HHS Office of the Inspector General ("OIG") cautioned that the purchase of a physician practice by a hospital

> "as a means to retain existing referrals or to attract new referrals . . . implicate[s] the anti-kickback statute because the remuneration paid for the practice can constitute illegal remuneration to induce the referral of business reimbursed by the Medicare or Medicaid programs." Ex. 2 (12/22/1992 HHS OIG Opinion Letter).

37.    The letter further advised that, in order to determine whether the price paid for a physician practice constituted an illegal kickback:

> "it is necessary to scrutinize the payments (including the surrounding facts and circumstances) to determine the purpose for which they have been made.  As part of this undertaking, it is necessary to consider the amounts paid for the practice . . . to determine whether they reasonably reflect the <u>fair market value</u> of the practice . . . , in order to determine whether such items in reality constitute remuneration for referrals."

(emphasis in original).

38.    Moreover, the letter cautioned:

> "When considering the question of fair market value, we would note that the traditional or common methods of economic valuation do not comport with the prescriptions of the anti-kickback statute.  Items ordinarily considered in determining the fair market value may be expressly barred by the anti-kickback statute's prohibition against payment for referrals. . . .  Accordingly, when attempting to assess the fair market value . . . attributable to a physician's practice, it may be necessary to <u>exclude from consideration any amounts which reflect, facilitate or otherwise relate to the continuing treatment of the former practice's patients</u>. . . .  Thus, any amount paid in excess of the fair market value of the hard assets of the physician practice would be open to question. . . .

Ex. 2 (emphasis added).

39.    Accordingly, HHS OIG has cautioned that valuing a physician practice or other physician investment using a formula based on the practice's revenue stream raises concerns

under the AKS.  Cash-flow based valuation is not per se a violation of the AKS, but it presents a significant concern because such a valuation would potentially lead to a payment based on the value of Medicare, Medicaid or other federal program referrals the selling physician made to the practice and/or might make to the practice in the future.  Cf. Ex. 3 (HHS OIG Advisory Opinion 09-09, at 7 n.5 (July 29, 2009)) ("a cash flow-based valuation of that business potentially would include the value of the [physicians'] referrals over the time that their [practice] was in existence prior to the [sale]")).  Accordingly, it is appropriate to apply heightened scrutiny to such transactions.

### 2.      Non-Competition Agreements

40.      The December 22, 1992 HHS OIG Opinion also cautioned that "payment for covenants not to compete" where there is a continuing relationship of referrals would raise the question of compliance with the AKS.  In some cases, payments for non-competition agreements unlawfully compensate a physician for steering patients for federally funded medical care or services.  Ex. 2.

### 3.      Joint Ventures and Other Physician Investments

41.      The HHS OIG has issued regulations defining certain "safe harbors" to describe types of financial relationships that would otherwise prohibited by the AKS, but do not present sufficient concern that they should ordinarily be subject to the law.  The burden is on the party seeking to benefit from the safe harbor to demonstrate that the transaction falls within the protection of the safe harbor.

42.      One such safe harbor covers certain situations in which a physician is an investor in a dialysis center or other business to which that physician makes referrals or otherwise recommends to patients.  See 42 C.F.R. § 1001.952.  Ordinarily, any money a physician received

as a result of his or her investment in the dialysis center – such as regular distribution of profits – could constitute illegal remuneration under the AKS.

43.    This "safe harbor" is narrowly tailored to prevent improper economic inducements from being disguised as unproblematic investment mechanisms.  As HHS OIG explained: "With respect to joint ventures, the major concern is that the profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals."  Ex. 4 (HHS OIG Advisory Opinion 97-5, at 7 (October 6, 1997)).

44.    An entity whose activity otherwise would be covered by the broad, remedial language of the AKS is exempted from liability through the "safe harbor" only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations. 42 C.F.R. § 1001.952(a).  Four of those requirements particularly relevant in the present case include that:

> (a)    "No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity;" and
>
> (b)    "The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity;" and

(c)     "No more than 40 percent of the entity's gross revenue related to the

furnishing of health care items and services in the previous fiscal year or previous

12-month period may come from referrals or business otherwise generated from

investors;" and

(d)     "The amount of payment to an investor in return for the investment

interest must be directly proportional to the amount of the capital investment

(including the fair market value of any pre-operational services rendered) of that

investor."

See 42 CFR § 1001.952(a)(2)(i), (iii), (vi) (viii).  ).  As will be discussed below, DaVita's

transactions with physicians do not fall within this safe harbor.

**B.      Compliance With the Federal Anti-Kickback Statute Is a Prerequisite to a Provider's Right To Receive or Retain Reimbursement from Federal and State-Funded Health Care Programs.**

45.     Compliance with the Anti-Kickback law is a precondition to participation as a

health care provider in federal and state-funded health care programs.  With regard to Medicare

and Medicaid, for example, each provider that participates in the programs must sign a provider

agreement with his or her state.  Although there are variations in the agreements among the

states, the agreement typically requires the prospective Medicare and Medicaid providers to

agree that they will comply with all legal requirements, which include the anti-kickback

provisions of the law.  In a number of states, the Medicare and Medicaid claim form itself

contains a certification by the provider that the provider has complied with all aspects of the

Medicare or Medicaid program, including compliance with federal laws.  Ex. 5 (examples of

form certifications for Medicare, Medicaid, and other federal health programs).

46.    In sum, either pursuant to provider agreements, claims forms, or in another manner, providers who participate in a federal or state-funded health care program must certify that they have complied with the applicable federal rules and regulations, including the AKS.

47.    Any party convicted under the AKS <u>must</u> be excluded from federal health care programs (<u>i.e.</u>, not allowed to bill for services rendered) for a term of at least five years. 42 U.S.C. §1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must also direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. §1320a-7(b).

48.    Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs. Similarly, compliance with the federal anti-kickback statute and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from state-funded health care programs.

## VI.    BACKGROUND

49.    Chronic kidney disease is a progressive disease, which ultimately destroys the kidney's ability to process and clean blood. The loss of kidney function is normally irreversible. End Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life. Dialysis is the removal of toxins, fluids and salt from the blood of ESRD patients by artificial means.

50.     Patients suffering from ESRD generally require dialysis at least three times per week for the rest of their lives.  There are more than 345,000 ESRD dialysis patients in the United States.

51.     Since 1972, the federal government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program regardless of age or financial circumstances.  Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests and medications.  Other Government-funded health care programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

52.     As of December 31, 2008, DaVita owns, operates and/or provides administrative services to 1,449 outpatient dialysis centers located in 43 states and the District of Columbia, serving approximately 112,000 patients.  Ex. 1 at 2.

53.     Approximately 87% of DaVita's total patients are covered by Government-funded health care programs.  Id.

## VII.   ALLEGATIONS

54.     DaVita's business model is fundamentally dependent on its relationship with physicians who refer patients to its dialysis centers – especially its relationships with the few key physicians who are responsible for a major share of all patients who are treated at the centers.  DaVita explained this dynamic succinctly in its 2008 annual report filed with the Securities and Exchange Commission as follows:

> "As is typical in the dialysis industry, one or a few physicians, including the
> center's medical director, usually account for all or a significant portion of a
> dialysis center's patient referral base.  Our medical directors provide a substantial

17

portion of our patient referrals. If a significant number of physicians were to cease referring patients to our dialysis centers, our business could be adversely affected." Ex. 1 at 9.

55.    Rather than working to generate business by simply demonstrating superior quality of clinical services and patient care, DaVita intentionally uses illegal kickbacks to physicians to secure a steady flow of referrals. DaVita routinely enters into joint ventures with these physicians, selling them shares of existing dialysis centers below fair-market value, and/or buying shares of dialysis centers above fair-market value from them. One DaVita manager explained to Relator that Deal Depot used these deals to funnel "a bag of money" to the physicians. In fact, the only possible motivation for DaVita to sell a physician an ownership interest in a center at below fair market value is to induce the physicians to commit to steer all or nearly all of their patients to DaVita-owned dialysis centers.

**A.    DaVita's "Buy High / Sell Low" Strategy**

56.    The AKS allows physicians to engage in certain business transactions with entities to which they refer patients. As discussed above, however, an essential limitation on such relationships is that any payments made to the physicians must be at fair market value. This rule is designed to prevent dialysis centers (and other referral-receiving companies) from disguising illegal kickbacks as inflated payments to physicians for other assets or services.

57.    The prices DaVita pays for dialysis centers it buys, and similarly its charges for centers it sells, violate this restriction. An elementary feature of the marketplace is that participants try to sell their goods and services for as much as possible, and buy goods and services as cheaply as possible (i.e., Buy Low / Sell High). DaVita's approach to dialysis center joint ventures turns this dynamic on its head. DaVita deliberately pays more than fair market

18

value for dialysis centers and joint-venture shares it buys from physicians in a position to refer business to the centers, and regularly charges cut-rate, below market prices when it sells shares of dialysis centers to physicians.

58.     This "Buy High / Sell Low" strategy is the cover DaVita uses to mask the illegal kickbacks it gives these physicians to secure a steady flow of referrals from them.

59.     DaVita masks and supports its "Buy High / Sell Low" strategy primarily through manipulation of the financial models its analysts and its outside appraisers use to calculate the value of dialysis centers.  DaVita personnel in its "Deal Depot" Mergers and Acquisitions department, under direct orders from the Vice Presidents and other managers in charge of the department, manipulate the valuation process with both ad hoc adjustments to various financial models, and through the application of non-standard – even illogical – (from an accounting point of view) formulas and algorithms.

60.     Some of the non-standard algorithms DaVita uses to "game" its projections tend to decrease the projected value of a dialysis center.  Others generally have the opposite effect, increasing the projected value of a center.  When DaVita sells centers to physicians, it uses the algorithms that decrease the value of the centers, thus decreasing the purchase price to the physicians.  Conversely, when it buys centers from physicians, DaVita tends to use only the algorithms that increase the values of centers, thus increasing the price paid to the physicians. The manipulative application of these algorithms, as standard practice, leads to the occasional over-valuing of the centers DaVita buys, and the systematic undervaluing of the centers it sells.

61.     The primary mechanism DaVita uses to depress the value of centers DaVita sells is the application of a financial algorithm known as HIPPER compression.  In addition to this structural machination, DaVita routinely manipulates its financial models by using artificial and

unreasonable values for expected costs or other key financial indicators.

62.     EBITDA is an accounting convention representing "Earnings Before Interest, Taxes, Depreciation and Amortization." EBITDA is a primary metric used by DaVita to value centers. EBITDA represents a measure of a center's earnings, and one way DaVita gauges the value of centers is based on a multiple of annual EBITDA. The higher the multiple, the more the buyer is paying for a particular stream of profits.

63.     As a result of DaVita's routine fraudulent manipulations, since 2006 DaVita has paid, on average, more than seven times (7x) a center's expected future annual EBITDA for dialysis centers it has purchased from physicians. Exs. 6 (Closed Deal Activity Spreadsheet // "2006 Closed Deals," "2007 Closed Deals," "2008 Closed Deals," "2009 Closed Deals" worksheets ) & 7 (DaVita M&A Transaction v8 spreadsheet). At the same time, however, Relator is aware from his experience and from discussions at DaVita that it charged less than three times (3x) a center's annual historical EBITDA when selling a dialysis center to physicians.

64.     Because of DaVita's manipulation, in at least one of the transactions where DaVita purchased a center, the price paid was so high that DaVita's expected rate of return on capital was less than its cost of capital. Conversely, the valuation DaVita assigned to centers it simultaneously sold shares in to the same physician group was less than 1/20th the per-center valuation of the centers it purchased, even though the centers it sold shares in had higher profits. Ex. 8 (Rocky Mountain 2008-04-21c 39.497M" // Summary worksheet) & Ex. 9 (Denver Transaction Summary). These manipulations resulted in money paid (and assets transferred) to referral sources in excess of any amount justified as fair market value. These overpayments were made for the specific purpose of inducing those referral sources to send their patients to DaVita

dialysis centers for medical services, including government funded services.

65.     One way that DaVita hides these machinations is through the selective use of third-party valuations. DaVita generally uses an outside firm, Duff & Phelps ("D&P"), to provide a "fair market value" opinion whenever DaVita sells ("divests" in DaVita's parlance) all or part of a dialysis center. DaVita manipulates these opinions to ensure they support the proposed sale price by "gaming" the revenue and cost assumptions given to D&P. Because D&P relies on these assumptions without independent confirmation, DaVita is able to ensure that these opinions say whatever DaVita wants them to say (i.e., they are not "independent" third-party valuations, but rather are valuations of projections which DaVita has manipulated).

66.     However, DaVita does not have a policy to get a "fair market value" opinion from D&P or any other firm when it buys all or part of a dialysis center. In this way, DaVita hides from D&P the substantial difference in its revenue and cost projections when it is buying versus selling a dialysis center.

67.     DaVita's suspect financial arrangements with patient referral sources were often most egregious in cases of "hotspots." Internally at DaVita, a "hotspot" is a competitive situation in which DaVita risked losing a prime relationship with a physician group to a DaVita competitor.

### 1.     HIPPER Compression

68.     HIPPER compression is an algorithm developed by DaVita and utilized as a policy from at least 2006. It is based on the presumption that insurance companies that pay the most for dialysis treatments will, within three years, be able to negotiate lower reimbursement rates to more closely mirror average rates. In DaVita's parlance, a HIPPER is a "High Paying Patient" (i.e. a patient with an insurance plan that reimburses at a high rate).

69.     The HIPPER compression algorithm assumes that no insurer will pay more than $750 per dialysis treatment, beginning in year 3 of a financial model.  Therefore, for patients whose insurance company would likely pay $1,200 per treatment, DaVita assumes that the insurance company will, in fact, lower its payment by over 40% per treatment from year 3 onward.

70.     The predictable and expected result of applying HIPPER compression to a financial analysis is that the dialysis center will be expected to have substantially lower future revenue, and thus will be less valuable.  HIPPER compression, however, is an overly conservative and unrealistic assumption, acknowledged even by DaVita's CFO, Richard Whitney, in a May 19, 2009 email.  In the email, Mr. Whitney (and other recipients) are asked about aspects of the acquisition revenue build up model, including specifically that it "compresses revenue to $750 all in for years 3 and beyond."  Mr. Whitney responds: "If all of our private pay compresses to 750 without increases in the lower rate biz or mcare [Medicare]. . .we are out of business.  In other words this is not a realistic assumption."  Ex. 10 (5/19/2009 email "RE: Acquisition Revenue Build Up Assumptions").

71.     As one of many examples, in the "Wauseon" partial divestiture in Ohio in November 2008, DaVita sold additional shares of a center to an existing joint-venture physician/referral source.  The application of HIPPER compression drove the value of the center down by more than 50%, from approximately $4.0M to $1.7M.  Ex. 11 (Wauseon Valuation Summary).  On the basis of this artificially low value, DaVita literally gave away to the referral source much of the value of the divested shares.

72.     Although DaVita's standard financial models provide that HIPPER compression should be used when valuing centers to be bought as well as those to be sold, in practice HIPPER

compression is not used when valuing centers to be bought. DaVita understands that the adjustment will produce valuations well below market and thus will not be accepted by any rational seller.

73. Sometimes DaVita simply did not use HIPPER compression, as in the following acquisitions: (a) the "Bakersfield" acquisition in California in October 2007, (b) the "SKI" acquisition in Arizona in December 2007, (c) the "Decatur" acquisition in Georgia in April 2008, (d) the "Coastal" acquisition in Florida in May 2008, (e) the "Kansas" acquisition in June 2008, and (f) the "Caucus" acquisition in Iowa in December 2008. Ex. 7 (DaVita M&A Transactions v8 spreadsheet).

74. In some acquisitions DaVita ostensibly used HIPPER compression, but negated its effect by artificially increasing the revenue-per-treatment cap significantly. For example, in the "Payton" acquisition, in Ohio in September 2008, DaVita increased the HIPPER per transaction cap from $750 to $950. More recently, in the "Stemmer" and "Central Florida" acquisitions in Florida in December 2008 and February 2009, respectively, the cap was increased from $750 up to $2500. Ex. 7 (DaVita M&A Transactions v8 spreadsheet).

75. More often, when valuing acquisitions DaVita overrides the effect of HIPPER compression through manual adjustments to revenue projections or patient volume projections, as described below.

### 2. Manipulating Individual Values Used in Financial Models

76. Beyond the use of non-standard algorithms, DaVita also routinely games the valuations produced by its financial models by arbitrarily manipulating the individual values that are plugged into standard formulas. Some typical examples of such manipulations include the following:

23

77.     DaVita routinely manipulates the estimate of how much it will cost to provide each treatment. For example, in most of its internal financial modeling and reporting, DaVita's accountants estimate that it costs the company $25-$35 in general and administrative ("G&A") expenses to provide each dialysis treatment. However, when projecting the value of dialysis centers DaVita intends to purchase, the analysts in Deal Depot are instructed to use an estimate of $13.50 per treatment for G&A expenses. In addition, they estimate that these expenses will remain constant from year to year regardless of inflation. By artificially underestimating the dialysis center's costs, this manipulation unrealistically inflates the profit the center is expected to generate and increases the projected "value" of the center.

78.     The impact of this one manipulation is significant. From 2007 to 2009, the difference between the price DaVita paid in 34 of its acquisition transactions was approximately $20 million (more than 10%) higher than the valuation would have justified if the value used for the expected expense per treatment were increased to just $18.00. Ex. 7 (DaVita M&A Transactions v8 spreadsheet). DaVita's finance team documented and recommended more accurate reflections of expense-per-treatment costs, but Deal Depot prevailed in its artificial manipulations without any apparent support or analysis.

79.     In a similar manner, DaVita routinely uses artificially low values for its expected bad debt (i.e., amounts due to DaVita that will be written off as uncollectable) to fraudulently increase the "value" it assigns to centers it plans to buy from physicians.

80.     On occasion, DaVita also manipulates other cost elements to achieve the same result. For example, in the "Atlanta Dialysis" transaction in December 2006 and a transaction with Dr. Dahhan in California in December 2007, DaVita depressed the expected staffing costs

to manipulate the valuation. Ex. 12 (Atlanta – Final Acquisition Model – 10.31.06.xls); Ex. 13 (Dahhan 120407 Version 2.xls // Consolidated P&L worksheet).

81.     On the revenue side of the transaction, DaVita uses multiple methods to inflate the valuation and hence the purchase price. For some transactions, DaVita increased the expected revenue by inflating the projected number of high paying (HIPPER) patients the center was expected to treat. This method, which effectively turns the usual HIPPER assumption on its head, is known colloquially within DaVita as using the "HIPPER bus" – i.e., assuming a mythic bus full of HIPPERs will routinely drop patients off at the center. For example, in the "Fayetteville" transaction in Arkansas in February 2008 – a transaction involving centers treating 110 patients – the initial projected revenue was $243 per treatment. DaVita increased this to $320 per treatment, by assuming the HIPPER bus would drop off 10 patients whose insurance policies each paid $1050 per treatment. Ex. 14 (Fayetteville RKC Model Post DD ROD Review Final $3.79MM 080114.xls // Summary worksheet).

82.     DaVita also increased the expected revenue per transaction by artificially increasing the amount of epogen each patient was projected to receive. Epogen is a drug given to patients during dialysis treatment. A substantial portion of the revenue DaVita receives for each treatment is attributable to the profit it makes on epogen. Id.

83.     In other situations, DaVita's method was far more direct – it simply increased the expected revenue per treatment. For example, in a transaction in Kansas in June 2008, DaVita "gamed" the revenue by simply bumping the expected revenue per treatment up from $310 to $350. Ex. 15 (Kansas – Post DD Model 06-05-08 $18.75M with Budgets.xls // Summary worksheet).

84.     Of late, DaVita has relied more on artificially increasing the "terminal value" of a

25

center to boost its projected value. DaVita's financial models (as is standard) estimate projected revenue year-by-year for a certain number of years going forward, and then account for all expected revenue beyond that point through use of a lump-sum amount. That lump sum is the "terminal value." This terminal value is usually calculated as a certain multiple of the center's expected annual earnings. A higher terminal value produces a higher overall projected value for the center.

85.    In recent years, DaVita has used progressively higher EBITDA multipliers, without justification, to produce higher terminal values and thus further arbitrarily inflate the projected value of centers it intends to buy. In 2007 the average terminal value was 5.3 times expected revenue. Ex. 7 (DaVita M&A Transactions v8 spreadsheet). In 2008, the multiple increased to 5.8 and in 2009 it is close to 7.0. Id. On one currently active deal the multiple is 7.8. Ex. 16 (KantTucker Model 2009-06-16.xls // Assumptions Summary worksheet).

86.    In order to artificially depress the value of centers DaVita sells to physicians, its managers and analysts reverse the ad hoc "gaming" method, artificially inflating the expected amounts to be paid for labor and other expenses and using HIPPER compression to artificially decrease the expected revenue.

87.    For example, on June 10, 2009, Relator was preparing the financial projections for a transaction involving the sale of seven DaVita-owned dialysis centers in the San Francisco East Bay. This transaction had not yet been completed at the time Relator left DaVita. The transaction was intended to address a "competitive hot spot," namely DaVita's concern that the physician group responsible for a substantial portion of the referrals to those facilities would decide to partner with a competing dialysis company, and send their patients to centers owned by that company. To prevent that defection, DaVita decided to sell these physicians an ownership

stake in the East Bay facilities, thereby providing them with a financial incentive to continue referring their patients there.

88.     While Relator was preparing the financial projections that DaVita planned to give its third-party valuation firm (D&P), Division Vice President Misha Palecek approached him. Mr. Palecek told Relator that he had artificially inflated the operating cost projections for the centers because he wanted to "crush the projections to keep the valuation low." When Relator indicated discomfort with that brazen admission, Mr. Palecek warned him not to "give me any of that ethics crap."

89.     DaVita was concerned that East Bay Nephrology (EBN) would balk at the dismal revenue projections contained in D&P's valuation, which incorporated the HIPPER-compressed artifice. Although DaVita offered to sell the shares at slightly above the ostensible fair market value obtained from D&P, DaVita did not share the D&P projections, instead directing the buyer (EBN) to use a financial advisor to create its own valuation numbers. EBN did so, ultimately using projections created by the financial advisor. Thus, DaVita possessed two sets of projections for the same centers: one using artificial HIPPER compression in the D&P valuation (concealed from the buyer), and another that was viewed by both parties and ostensibly relied upon by DaVita. In fact, DaVita needed the buyer's commissioned valuation because DaVita was afraid its own normally used and dismally low projections would scare the buyer off.

90.     As a result of HIPPER compression, and those ad hoc manipulations, the value assigned to the East Bay centers, for purposes of the sale to the referring physicians, was substantially lower than their fair market value. This "sell-low" transaction, if consummated, will result in free money to the physician in exchange for a guaranteed supply of referrals for DaVita.

91.     That the "gaming" of the financial models is standard practice at DaVita is illustrated by an email exchange among DaVita executives around the time Relator announced he was leaving the company.

92.     In a July 24, 2009 email to Relator (and copied to other members of the Deal Depot team), Bryan R. Parker, Vice President of Special Projects, wrote:

"Sorry to hear you are leaving us, but do wish you the best.

"I was hopeful before you leave you, or you and Queenie, can give us a list of the most common things one could do within the model to make sure it passes the COC ["Cost of Capital"] and IRR ["Internal Rate of Return"] hurdles. As we redesign the model I would like to be mindful of these."

93.     Chet Mehta, Vice President of Finance, responded: "Bryan - you mean 'gaming' the model, right?"

94.     To which Mr. Parker replied: "I do. Thanks Chet." Ex. 17 (2009-07-24 email RE DeNovo Model).

95.     The above exchange illustrates how DaVita management understands that its employees game the models, and only objects when the manipulation works to DaVita's disadvantage. Mr. Parker was inquiring about use of financial models to evaluate whether DaVita should build a new center (termed a "De Novo"). He was concerned because DaVita's regional directors receive extra compensation for new centers and therefore manipulate the models to make a De Novo appear more financially viable. In other words, as illustrated by the email, DaVita executives know full well that gaming of the financial models occurs.

### B.     DaVita Uses Non-Competition Agreements To Secure Referrals from Physicians To Whom it Has Paid Kickbacks

96.     In addition to the inflated payments for center acquisitions and below-market

28

sweetheart deals for sales, DaVita fraudulently ensures that it will receive the referrals from a physician or group to whom it pays kickbacks by requiring them to execute Medical Director Agreements with non-competition provisions. Through these contracts, DaVita ensures that the physicians will have no ownership interest in any other dialysis center during their tenure as Medical Director at the DaVita center (usually ten years) -- and thus will have no financial incentive to send referrals to any other center.

97.     The critical role these non-competition agreements, and their corresponding implicit guarantee of referrals, play in these transactions is illustrated in a July 25, 2008 email exchange between John Walcher, a DaVita Transaction Director, and Michael Staffieri, the Division Vice President, concerning a deal in the Klamath Falls region of Oregon. DaVita was buying a dialysis center, Sky Lakes Dialysis, and contemplating hiring as medical directors a group of physicians (Renal Care Consultants or "RCC") who, themselves, owned a separate group of dialysis centers. The RCC physicians were also responsible for a substantial portion of the referrals to the Sky Lakes center. Mr. Walcher asked Mr. Staffieri:

> "Do you want us to proceed with the acquisition in the event RCC sells
>
> their centers to FMC [a DaVita competitor] or some other competitor (whether or
>
> not RCC is the Sky Lakes medical director)?
>
> "Our concern is being able to close the Sky Lakes acquisition prior to
>
> knowing if RCC will sell to us or FMC. If you two are comfortable closing the
>
> Sky Lakes acquisition as long as RCC is the medical director (and is bound by a
>
> reasonable non-compete clause), we will push both Sky Lakes and RCC for a
>
> quick resolution to this issue. If we aren't willing to close Sky Lakes until we
>
> know whether or not we're buying RCC's centers, we'll need to delay the Sky

Lakes close (thereby potentially putting the deal in jeopardy) until we have

closure on RCC."

98.    Mr. Staffieri responded:

"I am less concerned about whether or not RCC sells its centers to us or

not.  The important thing is that they sign a 10-year MDA with a 25 mile non-

compete around Klamath Falls.  If they will not sign that agreement, then we are

wasting our time and money.  All the patients in Klamath Falls are theirs.

Without the agreement and non-compete, they will simply build a [a center of

their own] and move their referrals to the center and we will be left with nothing."

"Call me if you want to discuss.  I will not approve closing without RCC

signing an MDA."

Ex. 18 (2008-07-25 email RE Klamath Falls MDA Question) (emphasis added).

99.    In order to maximize the amount it would pay the RCC physician group for its

dialysis centers, DaVita assumed that half of the patient revenue from the Sky Lakes center

would be diverted to the RCC-owned centers, on the assumption that Sky Lakes would lose those

referrals if DaVita did not buy the RCC centers.  Ex. 19 (2009-05-05 email RE RCC sensitivity).

Of course, no such assumption of diminished revenue was used when calculating the price

DaVita paid a local hospital for the Sky Lakes center itself.

100.    DaVita also pays more for dialysis centers depending on the number of physicians

who would be bound to refer to DaVita through non-competition agreements or otherwise.  For

example, in an October 8, 2008 email from David Finn, Deal Depot Vice President, to Mr.

Walcher, the transaction director for the Klamath Falls deal, Mr. Finn wrote: "assuming we get

joinders from all docs in the med dir group (4?), you can go up to 3.5mm." Ex. 20 (2008-10-08 email RE Klamath Falls).

### C. Examples Illustrating the Effect of DaVita's Various Fraudulent Manipulations of its Valuation Models

#### 1. <u>Rocky Mountain Dialysis / Mountain West Dialysis Transaction</u>

101.    A prime example of DaVita's use of illegal kickbacks masked as joint ventures and other transactions to respond to a "competitive hot spot" – <u>i.e.</u>, the risk of loss of business to a competitor – occurred in Denver, Colorado in June 2008. This type of transaction, in which DaVita bought and sold centers in the same geographic market at the same time, is particularly revealing of DaVita's goal to funnel cash and other illegal remuneration to referring physicians.

102.    In the Spring of 2008, a DaVita-aligned physician practice, Western Nephrology, terminated its relationship with DaVita and moved forward with plans to build (and send its patients to) new dialysis centers in a joint venture with a different dialysis company. Prior to that time, Western Nephrology was responsible for a substantial portion of the referrals to DaVita's dialysis centers on the west side of Denver.

103.    In order to replace that business and maintain its market share, DaVita approached Denver Nephrology ("DN"), the physician practice that provided most of the referrals to DaVita's dialysis centers on the east side of Denver, to see if they would be interested in expanding to the west side of Denver. At that time, DaVita and DN were co-owners of Rocky Mountain Dialysis, a joint venture which ran three dialysis centers on Denver's east side.

104.    At the time, DN did not have any offices on the west side of Denver. DN was interested in DaVita's proposal, but did not want to commit the capital to open the necessary new offices across town. In order to finance DN's expansion, DaVita proposed a transaction that would give DN both an immediate cash infusion, and an ongoing share of the profits from

bought out DN's shares (49%) of Rocky Mountain Dialysis for over $19 million and (2) sold DN a 49% interest in joint ventures containing eight of DaVita's dialysis programs on the west side of Denver, for $3.8 million. Ex. 6 (Closed Deal Activity spreadsheet); Ex. 7 (DaVita M&A Transactions v8 spreadsheet); Ex. 21 (Membership Interest Purchase and Sale Agreement); Ex. 22 (Contribution Agreement); Ex. 23 (Intercompany Distribution Agreement); Ex. 24 (Stock Purchase Agreement); Ex. 25 (Asset Purchase Agreement).

105.    Although the centers were all in the same city/geographic region, the prices paid for the two types of transactions (purchase versus sale) were starkly different. On average, DaVita valued the centers it bought at approximately $13 million each, but only valued the centers it sold at approximately $635,000 each. Ex. 9 (Denver Transaction Summary). These price differentials reflect the impact of HIPPER Compression and other ad hoc manipulations DaVita used to fit the transaction into its Buy High / Sell Low kickback strategy.

106.    When DaVita first began analyzing this potential deal, Transaction Director Kenneth Leidner approached Relator and asked him to produce an analysis of the projected value of the three centers in the Rocky Mountain joint venture using DaVita's standard assumptions. Relator's preliminary model projected that the three centers were collectively worth $21.1 million.

107.    To reach this figure, Transaction Director Ken Leidner directed Relator not to use HIPPER compression. Accordingly, the model was gamed as follows: the effect of HIPPER compression was offset arbitrarily by increasing the expected revenue per treatment from $299 to $315; operating costs were arbitrarily reduced by decreasing the expected bad debt from $14.29 per treatment to only $7.88, and expected G&A costs from $23.04 to $13.50.

108.    Mr. Leidner then told Relator that Tom Usilton, Senior Vice President of

Corporate Development, requested a table showing the projected value for the centers that would

result if the model was further manipulated to reflect various EBITDA multiples and growth

rates.

109.    Relator later learned that DaVita was moving forward, but the Rocky Mountain

joint venture had been valued at some $39.5 million.  To reach this value, Deal Depot

management "gamed" the model even further, increasing the "terminal value" from $25 million

to $29 million, and slashing the required IRR from 16.7% to 3.5%.  Ex. 8 (Rocky Mountain

2008-04-21c 39.497M.xls //Summary worksheet)

110.    Near the time the transaction was set to close, Deal Depot's management sought a

third-party opinion to reflect that the approximately $39 million price for these three centers was

fair market value.  This was unusual because typically Deal Depot only sought fair-market-value

opinions on the value of centers it was selling.  Rather than use Deal Depot's usual valuation

firm, they gave the task to a new firm.  Relator was told that this new firm's analysis did not

support DaVita's desired $39 million price.  Instead, even using the doctored financial data

provided by DaVita, this new firm reported that fair market value for the three centers was no

more than $30 million.  When the valuation firm orally reported its findings, DaVita ordered the

company not to produce a written report of its findings, and consummated the deal based on its

inflated $39 million price.  DaVita managers told Relator that DaVita paid the new valuation

firm thousands of dollars for its unwritten services that DaVita ended up not using in the deal.

111.    Despite the gaming employed to inflate the purchase price of centers bought from

referring physicians, no such favorable manipulations were made when valuing the eight centers

DaVita sold to DN.  Instead, projected revenues were improperly depressed using HIPPER

compression. As a result, the prices charged to the physicians for these centers were barely at the value of the hard assets of the centers. Ex. 9 (Denver Transaction Summary)

### 2. St. Cloud, Florida Transaction

112. Another example of a transaction where DaVita both bought and sold shares of dialysis centers in the same general market, to the same physician, at the same time is the St. Cloud transaction in Florida in August 2007. In this transaction, DaVita: (1) bought a 60% interest in Nephrology Consultants Dialysis Center from its physician-owners; (2) sold a 40% interest in three existing DaVita dialysis centers in the same area to the same physician group; and (3) created a joint-venture with that physician group, which included ownership of the four existing dialysis centers, and one De Novo center. Ex. 26 (St Cloud Transaction Summary)

113. DaVita executed this transaction because, according to the Executive Summary of the deal analysis, the deal would: "Further align[] our interests with Internal Medicine Specialists (IMS), a leading physician group in Orlando with medical directorships . . . at 10 Orlando-area DaVita dialysis centers." In other words, the center was owned by an influential physician who (along with his medical group) was responsible for a substantial portion of the referrals to 10 existing DaVita dialysis centers. Ex. 26 (St Cloud Transaction Summary).

114. Relator has financial performance data for the center DaVita bought and one of the three centers it sold. According to this data, the center DaVita sold had comparable profits – earning $1.16 million versus $1.05 million earned by the center DaVita bought. The center DaVita sold was also busier – serving 154 patients versus 126 patients served by the bought center. Ex. 26 (St Cloud Transaction Summary).

115. Notwithstanding the comparable features of the two centers, DaVita attributed a much higher value to the center it bought. DaVita valued the center it bought at $5,975,000, but

only valued the three centers it sold at $3,075,000 total ($1,025,000 each).  Ex. 26 (St Cloud Transaction Summary).

116.   To justify the inflated price for the center it bought, DaVita gamed the model by simply increasing the expected revenue per treatment from $246 to $268.  DaVita also used artificially low figures for bad debt ($4.91 per treatment versus the average in that region of $9.20) and G&A expenses ($13.50 per treatment versus the average in that region of $22.62).  Ex. 27 (StCloud_Model_MSP_080107_final.xls // 'Consolidated P&L' worksheet).

117.   Even after DaVita gamed the profitability of the financial model for the center it bought, that center was still only slightly more profitable on a per treatment basis than one of the centers it sold – still far from justifying the highly inflated purchase price.

### 3.   Columbus, Ohio Transaction

118.   Two transactions in Columbus, Ohio provide another example of the different prices DaVita assigned to similar dialysis centers in the same market.  DaVita Financial Analyst Chris Pannell told Relator that, shortly before being acquired by DaVita in 2004, Gambro (DaVita's predecessor company) bought a group of dialysis centers from a physician group for $18 million.  Several years later, DaVita sold a 40% share in the same centers back to the same physician group, but this time based on a 100% valuation of only approximately $6 million, even though the financial situation of the centers and of the market had not changed in the intervening years.  Ex. 6 (Closed Deal Activity Spreadsheet ).

### 4.   Kidney Center, Inc. (aka Kant Tucker) Transaction

119.   DaVita's planned purchase of a large group of dialysis centers in Simi Valley, California provides a prime example of the extreme manipulations DaVita used to ensure that it would win access to physicians with a substantial referral base.  At the time Relator left DaVita,

the company was planning to purchase a number of dialysis centers from Kidney Center, Inc. This transaction is alternately known as the "Kant Tucker" transaction, named after the founder, CEO and president of KCI, Dr. Kant Tucker.

120.     The deal originally involved the purchase of 13 dialysis centers, where 1,145 patients received treatment. DaVita Senior Vice President Tom Usilton was in charge of the deal, and pushed aggressively to pay as much as possible to win the business because a deal with that many patients would have satisfied a large portion of Deal Depot's annual quota. DaVita's management expected Deal Depot to acquire centers whose physicians would refer at least 1,500 patients to DaVita centers in 2009.

121.     Mr. Usilton originally proposed purchasing all thirteen centers for $81 million, even though the deal would only produce an IRR of 2.7% at that price. Because this IRR is less than DaVita's cost of capital, DaVita would have been required (under Generally Accepted Accounting Principles) to record a loss as soon as the deal closed. Such a result was unacceptable, so Mr. Usilton began a process of manipulating the model to increase the reported IRR.

122.     As of the time Relator left the company, Mr. Usilton was pushing to pay $48.1 million for part of KCI. This price was more than double the amount supported by DaVita's financial models – even after the standard gaming was done to increase projected revenue and decrease costs. With standard gaming, the projected value was only $21.8 million.

123.     Mr. Usilton and Mr. Finn manipulated the model to justify the $48 million figure. To do this, Mr. Usilton and Mr. Finn first directed Relator to remove HIPPER compression, which increased the projected value to $28.8 million. Next, they decreased the expected cost of capital from 12% to 9%, which increased the projected value to $41.2 million. Then, they

further manipulated several of the values commonly used to game the model (increasing the expected revenue per transaction by $29, and reducing the expected G&A expenses from $13.50 to $9), which increased the projected value to $46.8 million. Two additional, smaller adjustments brought the final value to the desired $48.1 million. Ex. 28 (KCI Waterfall2.xls).

### 5. Other Transactions

124. Since 2002, DaVita has bought shares of dialysis centers, sold shares of dialysis centers or built De Novo centers for purposes of creating a joint venture with physicians in: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

125. Details of each of these transactions are contained in the table attached as Exhibit 6 to this Complaint. Ex. 6 (Closed Deal Activity Spreadsheet // worksheets 2002-2009).

126. Based on Relator's knowledge of DaVita's business practices as set forth herein, especially the use of HIPPER compression and the standard practice of "gaming" models using ad hoc adjustments to model assumptions, Relator alleges, on information and belief, that many transactions where DaVita sold referring physicians all or part of an existing DaVita center, bought all or part of a center from referring physicians, or entered into a joint venture involving existing or new dialysis centers violated the AKS statute.

127. In the time since these kickbacks were paid, these centers submitted many thousands of claims for payment for dialysis services to Medicare and other Government-funded health care programs. For the centers in suspect transactions in 2008 alone, the total amount

DaVita billed to Medicare and Medicaid was at least $49M. Ex. 29 (Centers of Interest2.xls). DaVita's systematic divestitures at artificially low prices potentially affected over 40 centers in 16 states in the past three years alone (since it instituted the HIPPER compression policy). Ex. 7 (DaVita M&A Transactions v8.xls). Extrapolated from the 2008 Medicare and Medicaid billings, these 40 centers billed Medicare and Medicaid well over $100M for dialysis and related products and services in the past three years.

128.    All claims for services submitted by DaVita or any of the physicians who received kickbacks are false claims within the meaning of the federal and Plaintiff State False Claims Acts.

### D.    DaVita's Payments for Referrals Are Not Sanctioned by any AKS Safe Harbor

129.    DaVita's "Buy High / Sell Low" strategy gives the physicians involved an immediate kickback, either the inflated sale price of the centers sold, or ownership of a share of existing centers at a below market value price. By forming joint ventures, DaVita provides those referring physicians an ongoing stream of kickbacks in the form of distribution of profits from the centers.

130.    As set forth above, HHS OIG has recognized that such revenue streams pose a substantial risk of violating the AKS, because the physician is in a position to earn profits based on the volume and value of referrals he or she sends to the joint venture. Accordingly, HHS OIG has created a safe harbor, which allows physician ownership of such joint ventures only if the transaction meets the eight requirements of the safe harbor. See 42 C.F.R. § 1001.952(a)(2).

131.    The DaVita joint ventures do not qualify for protection under that safe harbor, for several reasons. First, for joint ventures which include dialysis centers formerly owned solely by either DaVita or its physician partners, because of DaVita's fraudulent manipulation of the prices

it paid and charged for those centers, the relative ownership shares of DaVita and the physicians are not proportional to their respective capital contributions. When Davita sold a portion of its interest in a center at below market price, or purchased a portion at above market price, the physicians ended up owning a higher percentage of the true value of the center than their relative capital contribution. Thus, the profit distribution to the physicians are not "directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor." See 42 CFR § 1001.952(a)(2)(viii).

132.    Second, in many cases, physicians who refer business to the joint venture own more than 40% of the entity, in violation of 42 CFR § 1001.952(a)(2)(i). Although DaVita's official policy provides that, as a general rule, "DaVita should attempt to own at least 60% and have controlling rights for [any] JV," this rule may be, and regularly is, overridden. Examples of such transactions include the following:

- In the Rocky Mountain / Mountain West transaction, described in greater detail above, the Denver Nephrology physician group initially owned 49% of DaVita's Rocky Mountain Dialysis joint venture, and later owned 49% of DaVita's Mountain West Dialysis joint venture. Exs. 6, 9, 21. In February 2009, DaVita sold a 46% share in a dialysis center joint venture to the Florida Medical Clinic physician group in Florida in the "Zephyrhills" transaction. Ex. 7 (DaVita M&A Transactions v8.xls).

- In April 2009, DaVita sold a 49% share in a dialysis center joint venture in California to Capital Nephrology Medical Group in the "West Elk Grove" transaction. Ex. 7 (DaVita M&A Transactions v8.xls).

133.    Third, DaVita knows, and often expects, that physicians who own part of a

dialysis center joint venture will likely be responsible for more than 40% of the centers' gross revenue. Cf. 42 CFR § 1001.952(a)(2)(vi) As DaVita explained in its most recent SEC annual report: "As is typical in the dialysis industry, one or a few physicians, including the center's medical director, usually account for all or a significant portion of a dialysis center's patient referral base. Our medical directors provide a substantial portion of our patient referrals." Ex. 1 at 9. DaVita's joint venture partners were nearly always the medical directors and physicians who referred a high volume of patients to the centers.

134.    Finally, physicians are generally only offered the opportunity to join in a joint venture with DaVita if they have referred patients to DaVita centers in the past, or are in a position to do so in the future. Thus, the terms under which the physicians are allowed to invest are "related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity." Cf. 42 CFR § 1001.952(a)(2)(iii).

135.    A transaction that fails to comply with one of the safe harbors does not necessarily violate the AKS. Instead, the facts and circumstances surrounding such transactions must be analyzed to determine whether the physicians were paid, in whole or in part, in order to influence where the physicians referred their patients. As discussed above, DaVita's practices clearly evidence payments in exchange for referrals.

**E.    Purchases of Non-Competition Agreements**

136.    Another DaVita practice which violates the AKS is the stand-alone purchase of non-competition agreements. As set forth above, DaVita views non-competition agreements as an essential part of any transaction where it buys dialysis centers from or sells a share of centers to referring physicians. DaVita uses these agreements to functionally ensure that the physician

will refer his or her patients to DaVita centers by eliminating the physician's opportunity to have an ownership interest in, and thus a financial incentive to refer patients to, another center.

137.    Relator has been told by DaVita personnel that in some cases, DaVita has paid a physician to enter into a stand-alone non-competition agreement – i.e., a contract unrelated to the purchase or sale of shares in any dialysis center or joint venture.  This was done in situations where DaVita was concerned that a physician who referred a substantial volume of patients might decide to build or buy a dialysis center, either independently or in connection with a competing dialysis company.  Usually, in such situations, DaVita would sell the physician a share of DaVita's existing centers at a bargain price.  However, in some limited circumstances DaVita instead simply paid the physician to sign a stand-alone non-competition agreement, agreeing not to build a competing center.

138.    Through this practice, DaVita effectively paid the physician to continue referring patients to the DaVita center.  As such, this payment violates the AKS.  Any claims submitted for services rendered to the physician's patients are false claims within the meaning of the federal and Plaintiff State False Claims Act.

### Count I
### False Claims Act
### 31 U.S.C. §§3729(a)(1)(A)-(C)

139.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

140.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

141.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and

services to the United States Government for payment or approval.

142. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to a false or fraudulent claims for dialysis services and dialysis-related items and services.

143. By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to violate subsections a(1)(A) and a(1)(B) of 31 U.S.C. §3729.

144. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities, across the United States. Relator has no control over or dealings with such entities and has no access to the records in their possession.

145. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

146. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

147. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count II**
**California False Claims Act**
**Cal Govt Code §12651(a)(1)-(3)**

148. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

149.    This is a claim for treble damages and penalties under the California False Claims Act.

150.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

151.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

152.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

153.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

154.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

155.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

156.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count III
### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(c)

157.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

158.     This is a claim for treble damages and penalties under the Florida False Claims Act.

159.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

160.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

161.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

162.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

163.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

164.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

165.    Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count IV**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §49-4-168.1(1)-(3)**

166.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

167.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

168.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

169.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

170.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related

items and services allowed or paid by the State.

171.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

172.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

173.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

174.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count V**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. §175/3(a)(1)-(3)**

175.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

176.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

177.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

178.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the

State to approve and pay such false and fraudulent claims.

179.  By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

180.  Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

181.  The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct..

182.  By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

183.  Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count VI
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code Ann. §5-11-5.5-2(b)(1)-(2), (7)

184.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

185.  This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

186.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

187.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

188.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

189.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

190.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

191.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

192.    Additionally, the Indiana State Government is entitled to the maximum penalty of $5,000 for each and every violation alleged herein.

## Count VII
## Louisiana Medical Assistance Programs Integrity Law
## La. Rev. Stat. §437 et seq.

193.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

194.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

195.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

196.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

197.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

198.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

199.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

200.    By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count VIII
### Michigan Medicaid False Claims Act
### Mich. Comp. Laws. §400.601 et seq.

202.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

203.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

204.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

205.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

206.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they

entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

207.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

208.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

209.    By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

210.    Additionally, the Michigan State Government is entitled to the maximum civil penalties for each and every violation alleged herein.

### Count IX
### Nevada False Claims Act
### Nev. Rev. Stat. Ann. §357.040(1)(a)-(c)

211.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

212.    This is a claim for treble damages and penalties under the Nevada False Claims Act.

213.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

214.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

215.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

216.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

217.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

218.     By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

219.     Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count X**
**New York False Claims Act**
**N.Y. State Fin. §189(1)(a)-(c)**

220.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

221.   This is a claim for treble damages and penalties under the New York False Claims Act.

222.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

223.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

224.   By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

225.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

226.   The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

227.   By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

228. Additionally, the New York State Government is entitled the maximum civil penalty of $12,000 for each and every violation alleged herein.

### Count XI
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63 §5053.1(B)(1)-(3)

229. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

230. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

231. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

232. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

233. By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

234. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

54

235.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

236.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

237.    Additionally, the Oklahoma State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

### Count XII
### Tennessee False Claims Act and Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§4-18-103(a)(1)-(3) and 71-5-182(a)(1)(A)-(C)

238.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

239.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

240.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to Tennessee and the Tennessee Medicaid Program for payment or approval.

241.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce Tennessee and the Tennessee Medicaid Program to approve and pay such false and fraudulent claims.

242.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the

physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by Tennessee and the Tennessee Medicaid Program.

243. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

244. The Tennessee State Government and the Tennessee Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

245. By reason of Defendants' acts, Tennessee and the Tennessee Medicaid Program have been damaged, and continue to be damaged, in substantial amount to be determined at trial.

246. Additionally, Tennessee and the Tennessee Medicaid Program are entitled to the maximum penalty allowed by Tennessee law for each and every violation alleged herein.

### Count XIII
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002

247. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

248. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

249. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and

services to the State for payment or approval.

250.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

251.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

252.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

253.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

254.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

255.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count XIV
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(3)

256.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

257.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

258.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

259.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

260.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

261.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

262.    The Government of the Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

263.    By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

264.    Additionally, the Government of the Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XV
## Wisconsin False Claims for Medical Assistance Act
## Wis. Stat §20.931(2)(a)-(c)

265.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

266.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

267.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

268.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

269.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

270.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State. Relator has no control over or dealings with such entities and has no access to the records in their possession.

271.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

272.     By reason of Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273.     Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Prayer

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. §3729 et seq., and the counterpart provisions of the Plaintiff State statutes set forth above;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

4.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

5.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. §49-4-168.1;

6.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

7.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of Ind. Code Ann. §5-11-5.5-2(b);

8.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et seq.;

9.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus the maximum civil penalties allowed for each violation of Mich. Comp. Laws. §400.601 et seq.;

10.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

11.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. §189(1);

12.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63 §5053.1(B);

13.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus the maximum civil penalty allowable for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

14.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

15.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. §8.01-216.3(a);

16.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Wis. Stat §20.931(2);

17.     That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the State statutes set forth above;

18.     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

19.     That Relator recover such other relief as the Court deems just and proper.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:      September 11, 2009                    Respectfully submitted,

CROSS & BENNETT LLC

By _____
   Keith Cross (CO State Bar No. 8934)
   KCross@CrossBennett.com
   Cross & Bennett LLC
   108 E. St. Vrain, Suite #20
   Colorado Springs, CO  80903
   Tel.: (719) 633-1359
   Fax: (719) 633-5788

PHILLIPS & COHEN LLP
Eric R. Havian
erh@pcsf.com
Claire M. Sylvia
cms@pcsf.com
Jessica T. Moore
jtm@pcsf.com
PHILLIPS & COHEN LLP
131 Steuart St., Suite 501
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for Qui Tam Plaintiff David Barbetta

## Certificate of Service

I am a citizen of the United States, over the age of 18 and not a party to this action. My business address is 131 Steuart St., Suite 501, San Francisco, CA 94105.

On September 11, 2009, I served the foregoing documents described as:

COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS

WRITTEN DISCLOSURE STATEMENT

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as set forth below:

David M. Gaouette, Esq.
United States Attorney for the District of
   Colorado
1225 17th Street, Suite 700
Denver, CO 80202

The Honorable Eric H. Holder Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Edmund G. Brown Jr., Esq.
Attorney General of the State of California
Department of Justice
1300 I Street, 11th Floor
Sacramento, CA 95814

Bill McCollum, Esq.
Attorney General of the State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Alex Sink
Chief Financial Officer
Florida Department of Financial Services
Division of Legal Services
200 East Gaines Street
Tallahassee, FL 32399-0333

Thurbert E. Baker, Esq.
Office of the Attorney General for the State
   of Georgia
40 Capitol Square, SW
Atlanta, GA 30334

Lisa Madigan, Esq.
Attorney General for the State of Illinois
Attention: Patrick Keenan, Esq.
Bureau Chief, Illinois MFCU
100 W. Randolph, 12th Floor
Chicago, IL 60601

Greg Zoeller, Esq.
Attorney General of the State of Indiana
Indiana Government Center
302 W. Washington St.
Indianapolis, IN 46204

David Thomas, Esq.
Inspector General
150 W. Market St., Room 414
Indianapolis, IN 46204

James D. Caldwell, Esq.
Attorney General of the State of Louisiana
1885 North 3rd St. 6th Floor
Baton Rouge, LA 70802

Alan Levine, MD, Secretary
Louisiana Department of Health and Hospitals
1201 Capitol Access Road
Baton Rouge, Louisiana 70821-0629

Mike Cox, Esq.
Attorney General State of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
Box 30212
Lansing, MI 48909

Catherine Cortez Masto, Esq.
Attorney General of the State of Nevada
c/o Medicaid Fraud Control Unit
100 N. Carson Street
Carson City, NV 89701

Andrew M. Cuomo, Esq.
Attorney General State of New York
120 Broadway, 13th Floor
New York, New York 10271
Attention: SAAG Kathy Marks

W. A. Drew Edmondson, Esq.
Attorney General of the State of Oklahoma
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Robert E. Cooper, Jr., Esq.
Attorney General of the State of Tennessee
Office of the Attorney General and Reporter
Cordell Hull Building, Ground Floor
425 5th Ave. N
Nashville, TN 37243

Greg Abbott, Esq.
Attorney General of the State of Texas
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

Bob McDonnell, Esq.
Attorney General of the State of Virginia
Office of the Attorney General
900 East Main St.
Richmond, VA 23219

J.B. Van Hollen, Esq.
Attorney General of the State of Wisconsin
State Capitol, Suite 114 E.
P.O. Box 7857
Madison, WI 53707-7857

I caused such envelope(s) to be placed in the United States mail, postage fully prepaid, in accordance with the standard business practices of this office, in the city of San Francisco, California. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 11, 2009, in San Francisco, California.

Sherie McLean

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IHS DIALYSIS, INC., IHS DIALYSIS OF
MASSACHUSETTS, LLC, and IHS OF NEW
YORK, INC.,

                  Plaintiffs,             Docket No. 12 Civ. 2468 (ER) (LMS)

     -against-

DAVITA, INC.,

                 Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*See new ¶16.*

## STIPULATED PROTECTIVE ORDER AND CONFIDENTIALITY AGREEMENT

      IT IS HEREBY STIPULATED AND AGREED by the Parties to this action through their

respective counsel, as follows:

    1.     **PURPOSES AND LIMITATIONS.**

      Disclosure and discovery activity in this action may involve production of trade

secrets or other confidential research, development, or commercial information, within the

meaning of Fed.R.Civ.P. 26(c); or other private or competitively sensitive information for

which special protection from public disclosure and from use for any purpose other than

prosecuting this litigation would be warranted.  Accordingly, the Parties hereby stipulate to and

petition the Court to enter the following Stipulated Protective Order.  The Parties acknowledge

that this Order does not confer blanket protections on all disclosures or responses to discovery

and that the protection it affords extends only to the limited information that is entitled under

the applicable legal principles to confidential treatment.  The Parties further acknowledge, as

set forth in Section 10, below, that this Stipulated Protective Order creates no entitlement to file confidential information under seal.

**2.      DEFINITIONS.**

2.1     <u>Party</u>: any Party to this action, including all of its officers, directors, and employees.

2.2     <u>Disclosure or Discovery Material</u>: all information, regardless of the medium or manner generated, stored, or maintained (including, among other things, documents, testimony, transcripts, or tangible things) that are produced or generated in disclosures or responses to discovery in this matter.

2.3     <u>Protected Health Information</u>: any document or information supplied in any form, or any portion thereof, that identifies an individual or subscriber in any manner and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual or subscriber, the provision of health care to such individual or subscriber, or the past, present, or future payment for the provision of health care to such individual or subscriber.  "Protected Health Information" specifically includes "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996.  *See* 45 C.F.R. §§ 164.501 ("protected health information") and 160.103 ("individually identifiable health information").  "Protected Health Information" also includes all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from "Protected Health Information."

-2-

2.3   Confidential Information: information that contains, reflects, or reveals non-public, confidential, proprietary or commercial information that is not readily ascertainable through proper means by the public or the Receiving Party, to the extent that information either is the type of information that the Producing Party normally attempts to protect from disclosure or is subject to privacy protection under federal, state or local law.

2.4   Highly Confidential - Attorney Eyes Only Information – Attorney Eyes Only: information that contains or reveals trade secrets; business plans and strategies; pricing, rebate, or related information; confidential negotiations or contract terms between a Party and a non-party; financial or pricing data; planned or unpublished intellectual property applications; similar highly sensitive and proprietary commercial information; or Protected Health Information.

2.5   Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

2.6   Producing Party: a Party or non-Party that produces Disclosure or Discovery Material in this action.

2.7.   Designating Party: a Party or non-Party that designates information that it produces in disclosures or in responses to discovery as "Confidential" or "Highly Confidential - Attorney Eyes Only."

2.8   Protected Material: any Disclosure or Discovery Material that is designated as "Confidential" or as "Highly Confidential - Attorney Eyes Only."

2.9.   Outside Counsel: attorneys, along with their paralegals, and other support personnel, who are not employees of a Party but who are retained to represent or advise a Party in this action.

-3-

2781466v.2

2.10   In House Legal Personnel: attorneys along with their paralegals, and other support personnel, employed by a Party to perform legal functions who are responsible for overseeing this litigation for the Party.

2.11   Counsel (without qualifier): Outside Counsel and In House Legal Personnel (as well as their support staffs, including but not limited to attorneys, paralegals, secretaries, law clerks, and investigators).

2.12   Expert and/or Consultant: a person with specialized knowledge or experience in a matter pertinent to the litigation, along with his or her employees and support personnel, who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this action, and who is not currently an employee, nor has been an employee within four years of the date of entry of this Order, of a Party and who, at the time of retention, is not anticipated to become an employee of a Party.  This definition includes a professional jury or trial consultant retained in connection with this litigation.

2.13   Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, organizing, storing, retrieving data in any form or medium, etc.) and their employees and subcontractors.

**3.   SCOPE.**

The protections conferred by this Stipulated Protective Order cover not only Protected Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or Counsel in settings that might reveal Protected

Material. However, this Order shall not be construed to cause any Counsel to produce, return, and/or destroy their own attorney work product, or the work product of their co-counsel.

**4.     DURATION.**

The confidentiality obligations imposed by this Order shall remain in effect until the Court orders otherwise.

**5.     DESIGNATING PROTECTED MATERIAL.**

5.1     <u>Exercise of Restraint and Care in Designating Material for Protection.</u> Each Party or non-Party that designates information for protection under this Order must take care to limit any such designation to specific material that qualifies under the standards set forth herein and avoid indiscriminate designations.

If it comes to a Designating Party's attention that information that it designated for protection do not qualify for protection at all, or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all Receiving Parties that it is withdrawing or changing the mistaken designation.

5.2     <u>Manner and Timing of Designations.</u> Except as otherwise provided in this Order (*see, e.g.*, Section 5.2(b) below), or as otherwise stipulated or ordered, material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Notwithstanding the preceding sentence, should a Producing Party discover that it produced material that was not designated as Protected Material or that it produced material that was designated as Protected Material but had designated that Protected Material in the incorrect category of Protected Material, the Producing Party may notify all Parties, in writing, of the error and identifying (by bates number or other individually identifiable information) the affected documents and their new designation or re-designation.

2781466v.2

Thereafter, the material so designated or re-designated will be treated as Protected Material. Promptly after providing such notice, the Producing Party shall provide re-labeled copies of the material to each Receiving Party reflecting the change in designation. The Receiving Party will replace the incorrectly designated material with the newly-designated materials and will destroy the incorrectly designated materials.

Designation in conformity with this Order requires:

(a)     for information in documentary form (apart from transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY" on each page that contains protected material.

(b)     for testimony given in deposition, that a Party, or a non-Party that sponsors, offers, gives, or elicits the testimony, designate any portion of the testimony as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY," either on the record before the deposition is concluded, or in writing within fifteen (15) business days after the final transcript is received. Only those portions of the testimony that are designated for protection in accordance with the preceding sentence shall be covered by the provisions of this Stipulated Protective Order. The entire testimony shall be deemed to have been designated Highly Confidential - Attorney Eyes Only until the time within which the transcript may be designated has elapsed. If testimony is not designated within the prescribed time period, then such testimony shall not be deemed Confidential or Highly Confidential - Attorney Eyes Only except as ordered by the Court.

Transcript pages containing Protected Material must be separately bound by the court reporter, who must affix to each such page the legend "CONFIDENTIAL" or "HIGHLY

2781466v.2

CONFIDENTIAL - ATTORNEY EYES ONLY," as instructed by the Party or non-party sponsoring, offering, giving or eliciting the witness' testimony.

        (c)     for information produced in electronic or video format, and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored and/or transmitted the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY."

        5.3     Inadvertent Failures to Designate. If corrected, an inadvertent failure to designate qualified information as "Confidential" or "Highly Confidential - Attorney Eyes Only" does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. If material is re-designated as "Confidential" or "Highly Confidential - Attorney Eyes Only" after the material was initially produced, the Receiving Party, upon notification of the designation, must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

        5.4     Increasing the Designation of Information Produced by Other Parties or Non-Parties. Subject to the standards of Section 5.1, a Party may increase the designation (*i.e.*, change any Disclosure or Discovery Material produced without a designation to a designation of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY" or designate any Disclosure or Discovery Material produced as "CONFIDENTIAL" to a designation of "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY") of any Discovery Material produced by any other Party or non-Party, provided that said Discovery Material contains the upward Designating Party's own Confidential or Highly Confidential - Attorney Eyes Only Information.

-7-

Increasing a designation shall be accomplished by providing written notice to all Parties identifying (by bates number or other individually identifiable information) the Disclosure or Discovery Material whose designation is to be increased. Promptly after providing such notice, the upward Designating Party shall provide re-labeled copies of the material to each Receiving Party reflecting the change in designation. The Receiving Party will replace the incorrectly designated material with the newly-designated materials and will destroy the incorrectly designated materials. Any Party may object to the increased designation of Disclosure or Discovery Materials pursuant to the procedures set forth in Section 6 regarding challenging designations. The upward Designating Party shall bear the burden of establishing the basis for the increased designation.

6.   **CHALLENGING CONFIDENTIALITY DESIGNATIONS.**

6.1   Timing of Challenges. A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2   Meet and Confer. A Party that elects to initiate a challenge to a Designating Party's confidentiality designation must do so in good faith and must begin the process by notifying the Designating Party in writing its challenge and identify the challenged material, then conferring directly with counsel for the Designating Party. The Parties must then meet and confer in good faith. Each Party must explain the basis for its respective position about the propriety of the challenged confidentiality designations. The Parties shall have fourteen (14) days from the initial notification of a challenge to complete this meet and confer process.

6.3   Judicial Intervention. In any judicial proceeding challenging a confidentiality designation, the burden of persuasion with respect to the propriety of the

-8-

confidentiality designation shall remain upon the Designating Party. If the Parties are not able to resolve a dispute about a confidentiality designation within the time provided in Section 6.2, above, the Parties shall, within fourteen (14) days thereafter, prepare and present to the Magistrate Judge a joint letter brief that identifies the challenged material and sets forth the respective positions of the Parties about the propriety of the challenged confidentiality designations. Until the ruling on the dispute becomes final, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation.

In the event that the final ruling is that the challenged material is not confidential or that its designation should be changed, the Designating Party shall reproduce copies of all materials with their designations removed or changed in accordance with the ruling within thirty (30) days at the expense of the Designating Party.

7.    **ACCESS TO AND USE OF PROTECTED MATERIAL.**

7.1    <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or produced by a Producing Party only in connection with this action for prosecuting, defending, or attempting to settle this action. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 11 (FINAL DISPOSITION) below, Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order. For purposes of this Order, a secure website, or other internet-based document depository with adequate security, for example, shall be deemed a secure location.

-9-

7.2 <u>Disclosure of "CONFIDENTIAL" Information</u>. Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Counsel, as well as employees of said Counsel to whom it is reasonably necessary to disclose the information for this litigation;

(b) current or former officers, directors, and employees of Parties to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement To Be Bound by Protective Order" (Exhibit A);

(c) Experts and/or Consultants with respect to each of whom (1) disclosure is reasonably necessary for this litigation, and (2) an "Agreement To Be Bound by Protective Order" (Exhibit A) has been signed;

(d) the Court and its personnel;

(e) stenographers, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement To Be Bound by Protective Order" (Exhibit A);

(f) the author, addressees, or recipients of the document, or any other natural person who would have likely reviewed such document during his or her employment as a result of the substantive nature of his or her employment position;

(g) witnesses in the action to whom disclosure is reasonably necessary for this litigation and whose testimony is dependent on reviewing the Confidential Information, and who have signed the "Agreement To Be Bound by Protective Order" (Exhibit A); provided that, Confidential Information may be disclosed to a witness during his or her deposition, but only if he or she has executed the "Agreement to Be Bound by Protective Order" (Exhibit A), which shall be

-10-

made an exhibit to the deposition transcript, or has agreed on the record to keep the information confidential and not to use it for any purpose, or has been ordered to do so; and provided further that, pages of transcribed deposition testimony or exhibits to depositions that reveal Confidential Information must be marked "Confidential" and separately bound by the court reporter and not included in the main deposition transcript and exhibit binder, and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

      (h)    any other person to whom the Designating Party agrees in writing or on the record, and any other person to whom the Court compels access to the Confidential Information.

      7.3    <u>Disclosure of "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY" Information.</u>

      Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information designated "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY" only to:

      (a)    the Receiving Party's Counsel, as well as employees of said Counsel to whom it is reasonably necessary to disclose the information for this litigation;

      (b)    Experts and/or Consultants with respect to each of whom (1) disclosure is reasonably necessary for this litigation, and (2) an "Agreement To Be Bound by Protective Order" (Exhibit A) has been signed;

      (c)    the Court and its personnel;

      (d)    stenographers, their staffs, and professional vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Agreement to Be Bound by Protective Order" (Exhibit A);

-11-

(e)     the author, addressees or recipients of the document, or any other natural person who would have likely reviewed such document during his or her employment as a result of the substantive nature of his or her employment position;

(f)     deposition witnesses, but only during their depositions, and only if they have executed the "Agreement to Be Bound by Protective Order" (Exhibit A), which shall be made an exhibit to the deposition transcript, or have agreed on the record to keep the information confidential and not to use it for any purpose, or have been ordered to do so, and: (i) only during questioning of the deposition witness by the Designating Party; or (ii) during questioning of the deposition witness by the Receiving Party of a witness produced by the Designating Party; provided that, pages of transcribed deposition testimony or exhibits to depositions that reveal Highly Confidential - Attorney Eyes Only Information must be marked "Highly Confidential - Attorney Eyes Only" and separately bound by the court reporter and not included in the main deposition transcript and exhibit binder, and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and provided, further that, the Parties will meet and confer if the Designating Party believes a particular document requires different treatment for use at deposition; and

(g)     any other person to whom the Designating Party agrees in writing or on the record, and any other person to whom the Court compels access to the Highly Confidential - Attorney Eyes Only Information.

7.4     Retention of Exhibit A. Outside Counsel for the Party that obtains the signed "Agreements To Be Bound by Protective Order" (Exhibit A), as required above, shall

retain them for one year following the final termination of this action, including any appeals, and shall make them available to other Parties upon good cause shown.

       7.5   <u>Retention of Protected Material</u>. Persons who have been shown Protected Material pursuant to Section 7.2(b), (f), or (g), or Section 7.3(e) or (f) shall not retain copies of such Protected Material.

## 8.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION.

       If a Receiving Party is served with a discovery request, subpoena or an order issued in other litigation or proceedings that would compel disclosure of any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY," the Receiving Party must so notify the Designating Party, in writing (by fax or electronic mail, if possible), along with a copy of the discovery request, subpoena or order, as soon as reasonably practicable.

       The Receiving Party also must immediately inform the Party who caused the discovery request, subpoena or order to issue in the other litigation that some or all the material covered by the subpoena or order is the subject of this Protective Order. In addition, the Receiving Party must deliver a copy of this Stipulated Protective Order promptly to the Party in the other action that caused the discovery request, subpoena or order to issue.

       The purpose of imposing these duties is to alert the interested Parties to the existence of this Stipulated Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interest in the court from which the discovery request, subpoena or order is issued. The Designating Party shall bear the burdens and the expenses of seeking protection in that court of its confidential or Highly Confidential - Attorney Eyes Only material. Nothing in these provisions should be construed as authorizing or

-13-

2781466v.2

encouraging a Receiving Party in this action to disobey a lawful directive from another court or entity with legal authority to compel disclosure.

9.    **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL.**

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement To Be Bound" that is attached hereto as Exhibit A.

10.    **FILING PROTECTED MATERIAL.**

Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with the Court's local rules.

11.    **FINAL DISPOSITION.**

Unless otherwise ordered or agreed in writing by the Producing Party, within ninety days after the final termination of this action, including any appeals, each Receiving Party must return all Protected Material to the Producing Party. As used in this subdivision, "Protected Material" includes all copies, abstracts, compilations, summaries or any other form of reproducing or capturing any of the Protected Material. The Receiving Party may destroy some or all of the Protected Material instead of returning it. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing

-14-

2781466v.2

Party (and, if not the same person or entity, to the Designating Party) by the ninety-day deadline that identifies all the Protected Material that was returned or destroyed and that affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or other forms of reproducing or capturing any of the Protected Material. Notwithstanding this provision, counsel are entitled to retain a file copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence or attorney work product, even if such materials contain Protected Material. Any such file copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION) above. Any physical receptacles (e.g., boxes, file folders, redwells and the like) holding file copies containing or constituting Protected Material shall be clearly and prominently labeled "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY MATERIALS ARE CONTAINED HEREIN."

## 12.     INADVERTENTLY PRODUCED DOCUMENTS.

If a Party at any time notifies any other Party that it inadvertently produced documents, testimony, information, and/or things that are protected from disclosure under the attorney-client privilege, work product doctrine, and/or any other applicable privilege or immunity from disclosure, or the Receiving Party discovers such inadvertent production, the inadvertent production shall not be deemed a waiver of the applicable privilege or protection. The Receiving Party shall immediately return all copies of such documents, testimony, information and/or things to the inadvertently producing Party and shall not use such items for any purpose until further order of the Court. In all events, such return must occur within three (3) business days of receipt of notice or discovery of the inadvertent production. The return of any discovery item to the inadvertently producing Party shall not in any way preclude the

Receiving Party from moving the Court for a ruling that the document or thing was never privileged.

**13.   ATTORNEY RENDERING ADVICE.**

Nothing in this Protective Order will bar or otherwise restrict an attorney from rendering advice to his or her client with respect to, this matter or from relying upon or generally referring to "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL - ATTORNEY EYES ONLY" Disclosure or Discovery Material in rendering such advice; provided however, that in rendering such advice or in otherwise communicating with his or her client, the attorney shall not reveal or disclose the specific content thereof if such disclosure is not otherwise permitted under this Protective Order.

**14.   DISPOSITIVE MOTION HEARINGS AND TRIAL.**

The terms of this Protective Order shall govern in all circumstances except for presentations of evidence and argument at hearings on dispositive motions and at trial. The Parties shall meet and confer in advance of such proceedings and seek the guidance of the Court as to appropriate procedures to govern such proceedings.

**15.   MISCELLANEOUS.**

15.1   <u>Right to Further Relief.</u> Nothing in this Order abridges the right of any person to seek its modification or clarification by the Court in the future.

/ / /

/ / /

/ / /

/ / /

/ / /

-16-

2781466v.2

15.2   <u>Right to Assert Other Objections.</u> By stipulating to the entry of this

Protective Order no Party waives any right it otherwise would have to object to disclosing or

producing any information on any ground not addressed in this Stipulated Protective Order.

Similarly, no Party waives any right to object on any ground to use in evidence of any of the

material covered by this Protective Order.

Dated: February 18, 2014

*¶ 16 This Order is subject to the provisions of Standing Order M-10-468, entered 10/5/01, a copy of which is attached hereto.*

**CONSENTED TO:**

/s/ John S. Gibson
John S. Gibson
Crowell & Moring LLP
3 Park Plaza, 20th Floor
Irvine, California 92614
*Counsel for Defendant DaVita
HealthCare Partners, Inc.*


/s/ Kevin G. Donoghue
Roy W. Breitenbach
Kevin G. Donoghue
Garfunkel Wild, PC
111 Great Neck Road, Sixth Floor
Great Neck, NY 11021
*Counsel for Plaintiffs IHS Dialysis,
Inc.; IHS Dialysis of Massachusetts,
LLC; and IHS of New York, Inc.*

**IT IS SO ORDERED** this 20th day of February, 2014

Hon. Lisa Margaret Smith, U.S.M.J.

-17-

## EXHIBIT A

### AGREEMENT TO BE BOUND

I, _____ [print full name], of

_____

[print or type full address], declare under penalty of perjury under the laws of the United States

of America that I have read in its entirety and understand the Stipulated Protective Order that

was issued by the United States District Court for the Southern District of New York in the case

captioned *IHS Dialysis, Inc., et. al., v. DaVita, Inc.*, No. 12 Civ. 2468 (ER).

      I agree to comply with and to be bound by all the terms of this Stipulated

Protective Order, and I understand and acknowledge that failure to comply could expose me to

sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose

in any manner any information that is subject to this Stipulated Protective order to any person or

entity except in strict compliance with the provisions of this Order.

      I further agree to submit to the jurisdiction of the United States District Court for

the Southern District of New York for the purpose of enforcing the terms of this Stipulated

Protective Order, even if such enforcement proceedings occur after the termination of this

action.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

-18-

2781466v.2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
IN THE MATTER OF RETENTION OF          :
SEALED DOCUMENTS IN CIVIL CASES        :          STANDING ORDER
                                       :          M-10-468
                                       :
------------------------------------X

FILED
OCT 0 5 2001
U. S. DISTRICT COURT
S. D. OF N. Y.

MICHAEL B. MUKASEY, CHIEF JUDGE:

    Any protective order in any civil case that provides for the filing of information under seal shall include the following provision:

    "Sealed records which have been filed with the clerk shall be removed by the party submitting them (1) within ninety (90) days after a final decision is rendered if no appeal is taken, or (2) if an appeal is taken, within thirty (30) days after final disposition of the appeal.  Parties failing to comply with this order shall be notified by the clerk that, should they fail to remove the sealed records within thirty (30) days, the clerk may dispose of them."

    This order will be self-executing, in that the Clerk will treat all protective orders that direct the sealing of documents in civil cases as if they contain the above provision.

SO ORDERED:

Dated:  New York, New York
        October 5, 2001

Michael B. Mukasey,
U.S. District Judge

MICROFILM
OCT - 5 2001  -3:00 RM